UNITED STATES of America

v.

**Robert Steven Brodie WILLIAMS, Defendant.**

**No. 09 Cr. 1202(PGG).**

United States District Court, S.D. New York.

Dec. 13, 2010.

Rachel Peter Kovner, United States Attorney Office, New York, NY, for Plaintiff.

Melinda Marie Sarafa, Sarafa Law, LLC, New York, NY, for Defendant.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge:

Defendant Robert Steven Brodie Williams is charged in a three-count indictment with: (1) conspiracy to engage in the unlicensed dealing of firearms, in violation of 18 U.S.C. §§ 371, 922(a)(1)(A) and 922(a)(5); (2) possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1); and (3) unlawful transport of firearms, in violation of 18 U.S.C. § 922(a)(5).

Williams moves to suppress all evidence obtained as a result of a search of Apartment 3C, 1200 College Avenue, Bronx, New York, contending that the affidavit submitted in support of the search warrant application for that apartment contains false statements and suffers from numerous material omissions. Williams also seeks to suppress all of his post-arrest statements to law enforcement authorities, claiming that they were obtained in violation of the Fifth Amendment.

For the reasons set forth below, Williams' motion to suppress is denied as to the evidence recovered during the search but granted as to his post-arrest statements.

### BACKGROUND

Williams was arrested on October 20, 2009, after agents and police officers executed a search warrant at Apartment 3C, 1200 College Avenue, Bronx, New York (the "College Avenue apartment"). During their search of the College Avenue

apartment, agents recovered four firearms and ammunition. (Cmplt. ¶ 13) At the apartment and later at the 44th Precinct, Williams made post-arrest statements indicating, *inter alia,* that the guns belonged to him. (Williams Decl. ¶¶ 7–8; Cmplt. ¶ 14; Sarafa Decl., Ex. F)

## I. THE INVESTIGATION OF FIRE-ARMS TRAFFICKER "ALABAMA"

In February 2008, officers of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the New York City Police Department ("NYPD") began an investigation into an individual suspected of buying firearms in Alabama and transporting them to New York for sale. (Cmplt. ¶ 7; S.W. Aff. ¶ 6)[1] At that time, Detective Chris Alicea, an NYPD officer, arrested an individual for marijuana possession (the "CI") who told him about a "young, black male" who was transporting firearms from Alabama to New York City. (Tr. 5–6, 28–29)[2] The CI referred to the man only as "Alabama." (Tr. 6)

The CI provided Detective Alicea with a cell phone number and a home telephone number for "Alabama." (Tr. 7) Detective Alicea gave those numbers to Special Agent Ken Crotty of ATF. (*Id.*) Agent Crotty, working with Special Agent Darryl M. Grear, used the AutoTrack database to trace the two telephone numbers. (Govt. Ex. 1; Tr. 130–40) "Phillip Richard Burroughs" was one of the names associated with one of the telephone numbers. (Gov't Ex. 1; Tr. 7–8) "Phillip Burroughs" is an alias used by Phillip Richard Scott. (Gov't Ex. 2; Tr. 10)

Detective Alicea showed the CI two photographs of Scott. The CI identified the man in the photos as "Alabama." (Tr. 9) Detective Alicea told the CI that the man's true name was Phillip Burroughs. (*Id.*) Although the CI had not referred to "Alabama" as Phillip Burroughs before that point, after Detective Alicea identified the man in the photographs by that name, the CI at times referred to "Alabama" as Phillip Burroughs. (Tr. 9–10)

As the investigation proceeded, Detective Alicea recorded telephone calls made by the CI to "Alabama." (Tr. 10–11) On one of these calls, the CI referred to "Alabama" as "Charles." (Sarafa Decl. ¶ 13; Tr. 11) Detective Alicea testified that he was not aware that the CI referred to "Alabama" as "Charles" until he listened to the recording of the call in preparation for his testimony at the suppression hearing. (Tr. 11)

In March 2008, the CI and "Alabama" agreed that "Alabama" would travel to New York to sell firearms to the CI. (Cmplt. ¶¶ 8–9; Tr. 12, 14) On March 7, 2008, the CI met "Alabama" at the Port Authority Bus Terminal and took him to the parking lot of a Burger King in the Bronx. (Cmplt. ¶ 9; Tr. 14) There, the CI introduced "Alabama" to an undercover law enforcement officer, who purchased three firearms from "Alabama." (Cmplt. ¶ 9; Tr. 14–15) The undercover officer was later shown photographs of Phillip Richard Scott, also known as Phillip Burroughs, which Detective Alicea had previously shown to the CI. (Tr. 16) The undercover officer likewise identified the man in the photographs as "Alabama," the man who had sold the undercover officer three firearms. (*Id.*)

1. "S.W. Aff." refers to the affidavit of Special Agent Peter D'Antonio submitted in support of the application for a warrant to search the College Avenue apartment. The affidavit is attached as Exhibit A to the Sarafa Declaration.

2. "Tr." refers to the transcript of the June 7, 2010 suppression hearing.

"Alabama" was not arrested after the March 2008 sale of firearms, because Detective Alicea intended to purchase additional firearms from "Alabama." (Tr. 15) After the March 2008 sale, however, the CI and "Alabama" had a physical altercation. (Tr. 16) Detective Alicea testified that, as a result of this altercation, the "ties [between the CI and 'Alabama'] kind of broke" and the CI "felt real uneasy dealing with ['Alabama'] after that." (*Id.*) The CI was not able to arrange any additional purchases of firearms from "Alabama." (*Id.*)

In February 2009, ATF Special Agent Peter D'Antonio assumed responsibility for the "Alabama" investigation. (Tr. 101) Agent Crotty and Detective Alicea briefed Agent D'Antonio on the investigation, and D'Antonio also reviewed reports that had been prepared during the investigation. (Tr. 102) Based on the briefing and the reports he had reviewed, Agent D'Antonio sought an arrest warrant for Phillip Richard Scott. (Tr. 105)

On June 23, 2009, a criminal complaint was filed in the Southern District of New York charging Phillip Richard Scott with possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), (Sarafa Decl. ¶ 11, Ex. B), and on August 11, 2009, Scott was indicted on this charge. (Sarafa Decl. ¶ 12) On September 18, 2009, defense counsel brought to the attention of the Government and the Court that Scott had been incarcerated since at least 2004, and thus could not have been involved in a March 7, 2008 sale of firearms. (Sarafa Decl., Ex. C) As a result, the Government recommended that an order of *nolle prosequi* be filed as to the indictment against Scott. (Sarafa Decl., Ex. D) Judge Koeltl entered the order of *nolle prosequi* on September 26, 2009. (*Id.*)

## II. *THE SEARCH WARRANT*

On October 20, 2009, the CI called Detective Alicea to report that he had seen "Alabama" and two other individuals selling firearms at 1200 College Avenue, Apartment 3C, in the Bronx. (Tr. 18) Detective Alicea instructed the CI to return to the College Avenue apartment, purchase a firearm, and then call again once he had left. (Tr. 19) The CI later told Detective Alicea that he had gone to the apartment, had seen multiple firearms offered for sale, and had purchased a firearm from "Alabama" for $750. (Tr. 19–20, 88) The CI also turned over the gun he had purchased to Detective Alicea. (Tr. 19)

At approximately 4:30 that afternoon, Detective Alicea reported to Agent D'Antonio the CI's information about the firearms, stating that nine guns were for sale at the College Avenue apartment. (Tr. 20–21, 109, 172) Agent D'Antonio did not speak with the CI, nor had he ever met the CI prior to October 20, 2009. (Tr. 109)

Agent D'Antonio contacted the U.S. Attorney's Office for the Southern District of New York and worked with an Assistant United States Attorney to prepare an application for a search warrant for the College Avenue apartment. (Tr. 109–110) Agent D'Antonio signed an affidavit setting forth the factual basis for the search warrant application. (Tr. 109) Agent D'Antonio testified that he did not independently corroborate the information provided to him by Detective Alicea because "[t]ime was of the essence" in securing a search warrant for the College Avenue apartment. (Tr. 110–11, 182)

D'Antonio's affidavit set forth the background of the investigation into "Alabama" and the details of what the CI had conveyed to Detective Alicea about the events of October 20, 2009. The affidavit discusses "Alabama's" March 2008 sale of fire-

arms to the undercover office, and discloses that both the CI and the undercover officer had misidentified Phillip Scott as "Alabama." (S.W. Aff. ¶¶ 7–11) The affidavit also recounts the CI's call to Detective Alicea and the CI's subsequent purchase of a firearm at the College Avenue apartment. (S.W. Aff. ¶¶ 12–16) In the affidavit, Agent D'Antonio acknowledges that much of the information set forth was provided by "the specified CW (confidential witness) or other law enforcement officer[s]" and is not based on his personal knowledge or observations. (S.W. Aff. ¶ 3)

The affidavit contains three clear inaccuracies. First, Agent D'Antonio indicates that he has been involved in the investigation "[s]ince in or about February, 2008." (S.W. Aff. ¶ 6) D'Antonio did not become involved in the investigation until February 2009, however. (Tr. 111) D'Antonio explains that the mistake "was a typo." (*Id.*)

Second, with respect to his prior contact with the CI, D'Antonio states: "I, and other law enforcement officers, have used the Informant in the past, and he has provided reliable information that has been corroborated by independent evidence. However, as set forth in this warrant, the Informant has also previously made an inaccurate photo identification connected to this case." (S.W. Aff. at 3, n. 1) At the suppression hearing, however, Agent D'Antonio testified that he had "never used the confidential informant" and that, in submitting the affidavit, he had relied exclusively on Agent Crotty and Detective Alicea's experience with the CI. (Tr. 109, 150)

Third, D'Antonio states in his affidavit that the CI knew "Alabama" as "Phillip Burrough" from the outset of the investigation. (S.W. Aff. ¶ 6) This statement is inaccurate. At the suppression hearing, Detective Alicea testified that the CI initially referred to the firearms trafficker as "Alabama." (Tr. 6) Only after Detective Alicea told the CI that the individual he had identified from photographs was named Phillip Burroughs did the CI use that name for "Alabama." (Tr. 9–10) Agent D'Antonio testified that he was aware of this fact at the time he signed the affidavit. (Tr. 111–12)

The affidavit's repeated references to the individual under investigation as "Phillip Burrough" are misleading given that Agent D'Antonio knew at the time that Phillip Scott, also known as Phillip Burrough, was not the firearms trafficker "Alabama." (*See* Tr. 107–108) Indeed, the affidavit acknowledges that the CI and the undercover officer misidentified Phillip Scott as "Alabama." (S.W. Aff. ¶¶ 9–10)

On the basis of Agent D'Antonio's affidavit, Magistrate Judge Gorenstein orally issued the requested search warrant for the College Avenue apartment at approximately 8:42 p.m. on October 20, 2009. (Tr. 112, 168; Sarafa Decl., Ex. A)

### III. THE SEARCH OF THE COLLEGE AVENUE APARTMENT AND WILLIAMS' POST–ARREST STATEMENTS

The search warrant for the College Avenue apartment was executed at approximately 10:30 p.m. on October 20, 2009. (Tr. 168) NYPD Emergency Services Unit personnel entered the apartment first, and secured its occupants. (Tr. 113) Five ATF agents, including Agent D'Antonio, and several additional NYPD officers, including Detective Alicea, then entered the apartment. (Tr. 113–14) Williams was handcuffed and placed under arrest at the time of entry. (Tr. 168)

Detective Alicea testified that three people were inside the apartment at the time of the search: Defendant Williams, Loren-

zo Walker, and a "handicapped female." (Tr. 22) Agent D'Antonio recalled that Williams, Walker, Tafari Hubbard—the handicapped female identified by Detective Alicea—and Hubbard's mother, Virgie Hubbard, were present. (Tr. 114–15) Williams and Walker remained handcuffed during the search. (Tr. 23, 114)

Williams has submitted a declaration stating that police officers entered the apartment with guns drawn. He was thrown to the floor and handcuffed. One officer put his foot on Williams' back and a gun to his head and instructed him not to move. Williams was later instructed to sit on a couch. He remained handcuffed. Walker and Williams' sister Virgie were likewise handcuffed. (Sarafa Decl., Ex. E (Williams Decl.) at ¶¶ 4–5)

Law enforcement officers recovered four 9 mm. and 7.65 mm. semi-automatic handguns, and ammunition, immediately upon entering the apartment. (Tr. 114, 171, 175; Sarafa Decl., Ex. A) After the guns were recovered, Agent D'Antonio, along with his supervisor, ATF Special Agent Thomas Kelly, questioned Williams and Walker, who were handcuffed at the time. Agent D'Antonio did not administer *Miranda* warnings to Williams and Walker before interrogating them. (Tr. 115–16, 173) Agent D'Antonio asked the two men "whose firearms they were." (Tr. 114–15) Williams responded "that the firearms were all his,"[3] and "that he didn't want to get his cousin [—Walker—] involved." (Tr. 115, 173) Agent D'Antonio who expected to find nine firearms in the apartment (Tr. 172)—also asked where the other firearms were, and where the third gun trafficker—the man believed to be "Alabama"—was. (Tr. 172, 186) The record does not indicate that Williams offered any information at this time concerning the location of "Alabama" or the other firearms.

Agent D'Antonio testified that his purpose in questioning Williams and Walker at the apartment was (1) to establish "who owned the guns that were found in the apartment;" (2) to "find out possibly information on the additional five guns, where they might have went to"; and (3) to locate "Alabama." (Tr. 172–73, 188–89, 115–16)

Williams was transported to the 44th Precinct at approximately 11:50 p.m. (Tr. 116, 173–74) Williams was brought to an interview room, where the handcuffs placed on him at the time of his arrest were removed. (Tr. 121, 123, 178) At approximately 12:15 a.m. on October 21, 2009, Agent D'Antonio read Williams *Miranda* warnings from a printed form. (Tr. 118–19) ATF Agent Kelly and NYPD Detective Hector Santiago were also present. (Tr. 121)

Williams indicated that he understood his rights and agreed to waive them in writing. (Tr. 119–20; Sarafa Decl., Ex. F) Agent Kelly left the room, and Agent D'Antonio and Detective Santiago then proceeded to question Williams. (Tr. 122, 178–79) D'Antonio testified that he offered water to Williams at the 44th Precinct and that Williams remained calm throughout the interrogation. (Tr. 122) Williams never asked that questioning be stopped, never asked for a lawyer, and never indicated that he was uncomfortable in any way. (Tr. 123–24) Williams did stress that he did not want to get his cousin in trouble. (Tr. 124)

---

**3.** In his declaration, Williams states that officers asked "Where's Charles?" and "demanded to know whose guns were in the apartment." Williams further claims that officers threatened "that if no one took ownership of the guns then we would all go to jail. I eventually said that the guns were mine." (Sarafa Decl., Ex. E (Williams Decl.) ¶¶ 4, 7)

The questioning at the College Avenue apartment and at the 44th Precinct generally involved the same subjects: ownership of the guns, the whereabouts of other firearms, and the location of "Alabama." Williams gave much more detailed information at the police station, however. (Tr. 123, 178–79; Sarafa Decl., Ex. F) Agent D'Antonio's report of the second interrogation reflects the following:

3. WILLI[A]MS stated that sometime in June and/or July 2009 he was approached by an individual he knows only as Charles SMITH in Birmingham, AL. He has know[n] SMITH for approximately ten (10) years and describes him as a black male approximately 25 years old 5'8" 145 lbs and a street hustler from Birmingham, AL. SMITH told WILLIAMS that he knew of a way to make "big money" by buying guns real cheap in Alabama and then bringing them up to New York City to resell. SMITH indicated to WILLIAMS that he had done this in the past and made a lot of money. SMITH told WILLIAMS to get his hands on as many guns as possible and that he would let him know when it was time to go to New York City and make some money.

4. Between June/July 2009 and October 2009 WILLIAMS stated that he was able to get six (6) firearms in Alabama. WILLIAMS indicated that he paid between $40 and $150 for each firearm and that the total cost was approximately $400.00 for all the firearms. WILLIAMS further stated that he bought all the guns "off the street" usually from drug addicts that stole them by breaking into cars and homes.

5. In October 2009 SMITH contacted WILLIAMS and told him that [ ]now was a good time to go to NYC since the weather had gotten colder there and they it would be easier to conceal their guns. WILLIAMS decided that they could stay at his sister's apartment located at 1200 College Ave Apt 3C Bronx, N.Y. since they did not [have] any other place to stay.

6. On October 17 at approximately 11:30 PM WILLIAMS, SMITH and Forenzo WALKER (DOB 6/20/90, cousin of WILLIAMS) boarded a Greyhound Bus in Birmingham, AL for New York City. All (3) three passengers paid cash for a one way ticket to New York City. WILLIAMS further explained that they couldn't buy a round trip ticket since they did not know how long it would take to sell the guns. WILLIAMS further stated that SMITH boarded the bus with approximately seven (7) firearms in a black knapsack and that Walker was only coming along for a free trip to New York City since he has never been there before but that he was aware that they were all going to NYC to sell some guns. WILLIAMS stated that he stored all six (6) of his guns in a large bubble jacket that [he] was wearing. WILLIAMS further stated that there was an agreement between himself and SMITH that part of the proceeds were to be split since SMITH had done this before and had the contacts in NYC. WILLIAMS stated that no such agreement existed between himself or WALKER but that he would take care of WALKER with some money before they left.

7. On October 19, 2009 at approximately 4:50 AM the bus arrived in the Port Authority Bus Terminal in New York, NY. All three individuals then took a livery cab to 1200 College Ave. Apt. 3C. They slept until approximately 1:00 PM. Both WILLIAMS and SMITH began making phone calls and developing contacts to sell the approximately thirteen (13) firearms that they had brought up.

8. On October 19 at approximately 6:00 PM WILLIAMS sold his first firearm. WILLIAMS described that the unknown male black entered the apartment building and met him outside of Apt. 3C. WILLIAMS was accompanied by SMITH and WALKER outside of residence. WILLIAMS described selling a black Smith and Wesson .40 cal Pistol for $500.00 WILLIAMS acknowledge[d] that he had a few more calls and visits that evening but that he did not sell any other firearms.

9. On October 20, 2009 between 1:00 PM and 3:00 PM WILLIAMS acknowledged selling his second firearm. WILLIAMS stated that just as in the first sale he met an individual that he did not know but that SMITH had sold guns to in the past. He described him as tall and thin black male. They met directly outside of Apt 3C in the hallway. Again WILLIAMS, SMITH and WALKER were all present and WILLIAMS acknowledges selling a Chrome .40 caliber Smith and Wesson with a black handle for $750. WILLIAMS acknowledges giving SMITH $350 and keeping $300 for himself. He also acknowledges giving WALKER some money. When informed that there was a $100 difference WILLIAMS recanted his statement and then stated that he did not want to get his [cousin] WALKER in any trouble and that he did not give him any money but only gave money to SMITH. WILLIAMS reiterated many times throughout that he did not want his cousin WALKER involved. WILLIAMS then stated that after this sale all three re-entered the apartment and a short time later SMITH got a phone call.

10. Immediately after receiving this phone call SMITH put all seven (7) of his firearms back in the same black knapsack and said that he had to go to Long Island. SMITH asked if anyone wanted to go with him but WILLIAMS refused saying that he didn't know anyone out there and did not feel safe. WILLIAMS also stated that he won't let his cousin WALKER go either. A short time thereafter SMITH left the apartment with his firearms and stated that he was going to get something to eat and then going out to Long Island to "sell the guns." WILLIAMS estimated that SMITH left approximately 30 minutes prior [to] the officer coming into the apartment for the search warrant.

(Sarafa Decl., Ex. F)

In his declaration, Williams states that he answered the questions posed by Agent D'Antonio and Detective Santiago at the 44th Precinct only because he had already made incriminating statements at the College Avenue apartment, before he was read *Miranda* warnings:

> Had I not been questioned at the apartment, and already said the guns were mine, I would not have signed the form waiving my rights and agreeing to answer questions. But I figured that, since I had already claimed ownership of the guns, nothing worse could happen, and I signed the form and made a statement.

(Sarafa Decl., Ex. E) (Williams Decl. ¶ 8) Williams did not testify at the suppression hearing.

## IV. *PROCEDURAL HISTORY*

On December 21, 2009, Williams was charged in a three-count indictment with: (1) conspiracy to engage in the unlicensed dealing of firearms, in violation of 18 U.S.C. §§ 371, 922(a)(1)(A) and 922(a)(5); (2) possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1); and (3) unlawful transport of

firearms, in violation of 18 U.S.C. § 922(a)(5). (Dkt. No. 6)

On April 23, 2010, Williams moved to suppress all evidence obtained as a result of the search of the College Avenue apartment and all of his post-arrest statements to law enforcement authorities.[4] (Dkt. No. 15)

On June 7, 2010, this Court held a hearing on Williams' motion to suppress. Detective Alicea and Agent D'Antonio testified at that hearing. The parties then filed post-hearing briefs, and on October 8, 2010, this Court heard oral argument. The parties submitted post-argument briefing on October 22, 2010. After the Second Circuit's decision in *United States v. Capers,* 627 F.3d 470 (2d Cir.2010), this Court invited, and received, supplemental briefing concerning the effect of *Capers* on Williams' motion to suppress the statements he made at the 44th Precinct.

## DISCUSSION

### I. WILLIAMS IS NOT ENTITLED TO A FRANKS HEARING

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

■ In reviewing an application for a search warrant,

[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

■ The determination of a magistrate judge as to the existence of probable cause to search is to "be paid great deference by reviewing courts." *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). However, "the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

■ While a reviewing court may inquire "into the knowing or reckless falsity" of an affidavit submitted in support of an application for a search warrant, the Second Circuit has noted that " 'every statement in a warrant affidavit does not have to be true.' " *United States v. Martin,* 426 F.3d 68, 73 (2d Cir.2005) (quoting *United States v. Canfield,* 212 F.3d 713, 718 (2d Cir.2000)). Moreover, " '[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.' " *United States v. Awadallah,* 349 F.3d 42, 67–68 (2d Cir.2003) (quoting *United States v. Colkley,* 899 F.2d 297, 300–01 (4th Cir. 1990)); *see also United States v. Vilar,* No. 05 Cr. 621(KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) ("All storytelling involves an element of selectivity, so it is not shocking that every affidavit will omit facts which, in retrospect, seem significant." (internal quotations omitted)).

---

4. The Government has stated that it does not intend to introduce Williams' statements at the College Avenue apartment. (Govt. Post-Hearing Br. 47 n. 9) Accordingly, this opinion addresses only the admissibility of Williams' statements at the 44th Precinct.

■ "To be entitled to a *Franks* hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions [in the affidavit] are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir.1998) (citing *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir.1987)); *see also Awadallah*, 349 F.3d at 64.

■ The determination of "[w]hether a person acted deliberately or recklessly is a factual question of intent...." *United States v. Trzaska*, 111 F.3d 1019, 1028 (2d Cir.1997). "Recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991).

■ "To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, 'a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant.'" *Canfield*, 212 F.3d at 718 (quoting *Trzaska*, 111 F.3d at 1027). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate. As with the inclusion of false information, 'omissions from an affidavit that are claimed to be material are governed by the same rules.'" *Id.* at 718 (quoting *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.1985)).

■ "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'"

*Awadallah*, 349 F.3d at 65 (quoting *Canfield*, 212 F.3d at 718).

### A. *Alleged False Statements and Material Omissions*

Williams contends that D'Antonio's affidavit contains five errors and seven material omissions. The alleged errors are as follows:

(1) The affidavit states that the CI had, in the past, "provided reliable information that has been corroborated by independent evidence." Without citation to the record, Williams' post-hearing brief argues that "[t]he only information that Agent D'Antonio had received regarding the reliability of the Informant was Detective Alicea's statement that he was a 'reliable informant.'" (Def. Post-Hearing Br. 17)

(2) The affidavit states that on the afternoon of October 20, 2009, "the Informant was told by another individual ... that guns were available for sale" at the College Avenue apartment. (S.W. Aff. ¶ 12) The affidavit indicates that after learning of this information, the CI "called a detective of the New York Police Department and advised the detective that guns were available for sale." (S.W. Aff. ¶ 13) Williams contends that this account is inaccurate because the CI entered the College Avenue apartment and observed firearms for sale before calling Detective Alicea. (Tr. 18)

(3) The affidavit states that Agent D'Antonio has been involved in the investigation of "Alabama" "[s]ince in or about February, 2008" (S.W. Aff. ¶ 6) when in fact D'Antonio did not become involved in the investigation until February 2009. (Tr. 111)

(4) The affidavit states that Agent D'Antonio had, along with "other law enforcement officers . . . used the Informant in the past . . ." (S.W. Aff. at 3 n. 1), when in fact D'Antonio had "never [personally] used the confidential informant." (Tr. 109, 150)

(5) The affidavit states that the CI knew the firearms trafficker under investigation as "Phillip Burrough" and indicates that the home telephone number provided by the CI was connected to an address related to Phillip Scott who uses "Philip Burrough" as an alias. (S.W. Aff. ¶¶ 6, 9) The CI, however, initially referred to the gun trafficker as "Alabama" and adopted the name "Phillip Burrough" only after Detective Alicea stated that he believed "Alabama" to be "Phillip Burrough." (Tr. 6, 9–10, 111–12)

(Def. Post–Hearing Br. 17–18)

▉ The first two alleged errors cited by Williams are not in fact errors. Agent D'Antonio was aware at the time he signed his affidavit that the CI had arranged for "Alabama" to come to New York in March 2008 to sell firearms to an undercover police officer. (Tr. 102) Given that the CI arranged the March 2008 firearms sale, it was not inaccurate for D'Antonio to state that the CI had "provided reliable information that has been corroborated by independent evidence."

▉ D'Antonio likewise did not misstate facts concerning the CI's entry into the College Avenue apartment and observation of firearms at that location. While

D'Antonio's affidavit does not disclose that the CI entered the apartment and observed firearms before contacting Detective Alicea—an omission discussed below— it does not misstate facts concerning this incident. The CI did in fact learn that guns were available for sale at the College Avenue apartment and relayed this information to Detective Alicea.[5] Because the first two alleged misstatements Williams complains about are not in fact inaccurate, they provide no basis for suppressing the evidence seized during the search.

As to material omissions, Williams complains that D'Antonio's affidavit does not disclose:

(1) that D'Antonio's understanding of the CI's reliability was based on a single statement by Detective Alicea that the CI was reliable;

(2) that D'Antonio had no personal contact with the CI prior to seeking the search warrant for the College Avenue apartment;

(3) that the CI was paid by the NYPD;

(4) the erroneous arrest and prosecution of Phillip Scott;

(5) the March 2008 physical altercation between the CI and "Alabama" and the impact of that altercation on their relationship;

(6) that the CI knew "Alabama" as "Charles" but failed to disclose that name to law enforcement officials, and that law enforcement officials knew that "Alabama's" real name was "Charles"; and

(7) that on October 20, 2009, the CI first went to the College Avenue apart-

---

**5.** Williams has also not introduced evidence showing that D'Antonio knew that the CI had entered the apartment before calling Detective Alicea. While Alicea testified that he told Agent D'Antonio about the CI's visit to the apartment to purchase a gun, Alicea did not

testify that he had told Agent D'Antonio about the CI's initial visit to the apartment. (Tr. 95–96) In short, there is no evidence that D'Antonio's omission was the result of "deliberate falsehood or reckless disregard for the truth." *See Salameh*, 152 F.3d at 113.

ment with an individual interested in purchasing firearms and only later informed Detective Alicea that firearms were for sale at the apartment. (Def. Post–Hearing Br. 18–21)

Williams' arguments concerning the first alleged omission—that Agent D'Antonio's understanding of the CI's reliability was based on a single statement by Detective Alicea—are misguided for reasons already stated. Agent D'Antonio's understanding of the CI's reliability was not based on a single statement from Detective Alicea. As discussed above, D'Antonio was aware that the CI had arranged a sale of firearms by "Alabama" to an undercover officer in New York in March 2008. (Tr. 102)

Williams' remaining alleged false statements and material omissions are discussed below.

### B. *Deliberate Falsehood or Reckless Disregard for the Truth*

■■■ As noted above, a defendant seeking an order suppressing evidence based on a defective search warrant affidavit must demonstrate that the errors or omissions in the affidavit were the result of the affiant's "deliberate falsehood or reckless disregard for the truth" and that "the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *Salameh*, 152 F.3d at 113. " '[A]n inaccuracy [in an affidavit] that is the result of negligence or innocent mistake is insufficient' " to undermine the validity of a search warrant. *Vilar*, 2007 WL 1075041, at *25 (quoting *United States v. Perez*, 247 F.Supp.2d 459, 472–73 (S.D.N.Y.2003)). "[U]nder *Franks*, the intent of the misstatement or omission must be to mislead the judicial officer into approving the requested warrant." *Id.*

■■■ "The meaning of an intentional falsehood is self-evident.' " *Id.* at *26

(quoting *United States v. Kunen*, 323 F.Supp.2d 390, 395 (E.D.N.Y.2004)). However, "the definition of 'reckless disregard' in the *Franks* context is less clear." *Id.*; *see also United States v. Harding*, 273 F.Supp.2d 411, 426 (S.D.N.Y.2003) ("There is little case law concerning the 'reckless disregard' standard in the search warrant context. The *Franks* Court failed to flesh out the standard directly . . . ."). While the Second Circuit has made clear that "[r]ecklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination," *Rivera*, 928 F.2d at 604; *see also United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.1996), it has not "define[d] what 'reckless disregard' means." *Vilar*, 2007 WL 1075041, at *26.

"[M]ost circuits that have considered the question have embraced a subjective test for recklessness similar to that used in First Amendment libel cases, namely that one 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations." *Id.* (citing *Miller v. Prince George's County, Md.*, 475 F.3d 621, 627 (4th Cir.2007); *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir.2002); *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir.1994); *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984); *United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir.1979)). "Lower courts in the Second Circuit have adopted the same test in several cases . . . ." *Vilar*, 2007 WL 1075041, at *26 (citing *Kunen*, 323 F.Supp.2d at 395; *Perez*, 247 F.Supp.2d at 473; *United States v. Markey*, 131 F.Supp.2d 316, 324 (D.Conn. 2001); *Rivera v. United States*, 728 F.Supp. 250, 258 (S.D.N.Y.1990)).

■■■ Here, Agent D'Antonio has conceded that his affidavit contained the following three inaccuracies known to him at the time: (1) that he first became involved

in the investigation in February 2008, when in fact he was assigned to the case in February 2009; (2) that he had "used the Informant in the past," when in fact he had never used the CI before; and (3) that the CI had identified the gun trafficker as "Phillip Burrough" when in fact the CI had referred to the gun trafficker as "Alabama," and only adopted the name "Phillip Burrough" after Detective Alicea told him that he believed that "Alabama" was "Phillip Burrough." (Tr. 109, 111–12, 150) Williams contends that Agent D'Antonio should likewise have been aware of the other allegedly false and misleading statements and omissions listed above, because—according to Williams—all of these statements and omissions were critical to the probable cause determination. Accordingly, the Court will now turn to the issue of whether "the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *See Salameh,* 152 F.3d at 113.

### C. *Probable Cause*

In determining whether "falsehoods or omissions were necessary to the judge's probable cause finding," a court must consider "whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Awadallah,* 349 F.3d at 65 (quoting *Canfield,* 212 F.3d at 718).

 A corrected affidavit in this case would state that: (1) Agent D'Antonio had been involved in the investigation of "Alabama" since February 2009; (2) Agent D'Antonio had not used the CI in the past; and (3) the CI knew the firearms trafficker as "Alabama" and adopted the name "Phillip Burrough" only after law enforcement officials advised him that that was the suspect's name. A corrected affidavit would also disclose that: (1) Agent D'Antonio had no personal contact with the CI prior to seeking the search warrant; (2) the CI was a paid informant; (3) Phillip Scott had been erroneously arrested and prosecuted as a result of the investigation of "Alabama;" (4) the CI and "Alabama" had a physical altercation in March 2008; (5) the CI knew "Alabama" as "Charles" but failed to disclose this name to law enforcement officials; and (6) on October 20, 2009, the CI first went to the College Avenue apartment with an individual interested in purchasing firearms and only later informed Detective Alicea that firearms were for sale at the apartment.

Here, after the erroneous information is put aside and the omitted material is added, the corrected affidavit is adequate to support a probable cause finding, because it sets forth facts demonstrating "a fair probability that contraband or evidence of a crime will be found in [the College Avenue apartment]." *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317. In particular, the corrected affidavit would recount—as did the original affidavit (S.W. Aff. at 3–7)— the CI's role in arranging the March 2008 firearms transaction and the events of October 20, 2009, including the CI's trip to the College Avenue apartment at the direction of Detective Alicea; the CI's observation of "three people ... each holding guns" inside the apartment; the CI's purchase of a firearm for $750; and the CI's surrender of the firearm to Detective Alicea. None of the false statements or material omissions alleged by Williams undermines these facts, which are more than adequate to establish probable cause.

With respect to the false statements and omissions concerning the length of time D'Antonio had worked on the case, and his prior use of the CI, submission of an affidavit stating that Agent D'Antonio became involved in the investigation in 2009, rath-

er than 2008, and that he had not worked with the CI before, would not undermine the probable cause finding. The affidavit submitted to the magistrate judge made clear that Agent D'Antonio's role in gathering the information presented was limited:

> Throughout this affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made, unless 1 specifically so state. Rather, information about the statement was provided by the specified CW (confidential witness) or other law enforcement officer (who may have had either direct or indirect knowledge of the statement) to whom I have spoken or whose reports I have read and reviewed. Such statements are set forth in substance and in part, unless otherwise indicated. Similarly, the information in this affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law enforcement officers who observed the events described, and to whom I have spoken or whose reports I have read.

(S.W. Aff. ¶ 3)

A corrected affidavit would state—as did the original affidavit (S.W. Aff., ¶ 6 n. 1)—that "other law enforcement officers[ ] have used the Informant in the past, and he has provided reliable information that has been corroborated by independent evidence," and would set forth the circumstances of the CI's ongoing cooperation in the investigation, including the CI's role in arranging the March 2008 firearms sale, and his report to Detective Alicea on October 20, 2009. The fact that Agent D'Antonio (1) joined the investigation a year later than indicated; and (2) did not personally know the CI, does not undermine the key facts establishing the CI's reliability, in-

cluding his role in arranging the March 2008 firearms sale to an undercover officer and his October 2009 purchase of a firearm in the College Avenue apartment. *See United States v. Pena,* 961 F.2d 333, 340 (2d Cir.1992) (collecting cases).

With respect to the false statement that the CI knew "Alabama's" name to be "Philip Burrough"—when in fact the CI adopted the "Phillip Burrough" name only after Detective Alicea stated that he believed "Alabama" to be "Phillip Burrough"—that correction bolsters rather than undermines the CI's reliability, as it makes clear that the source of the misidentification was law enforcement, and not the CI.

The remaining omissions cited by Williams likewise do not undermine the conclusion that the corrected affidavit would support a probable cause finding. Williams complains, for example, that the affidavit should have disclosed that Phillip Scott was erroneously arrested and prosecuted. The important aspect of the Phillip Scott incident, however, was the fact that the CI misidentified Scott as "Alabama." Agent D'Antonio's affidavit fully disclosed this misidentification. (S.W. Aff. ¶¶ 9–10) (noting, *inter alia,* that the CI "positively identified the person in the photograph as being the individual he knew as 'Phillip Burrough' .... Law enforcement personnel subsequently determined that the person shown in the DMV photo of Phillip Scott was not in fact the person who made the gun sale on or about March 7, 2008. In particular, Phillip Scott was imprisoned in Alabama on the date the gun sale occurred.") The erroneous arrest and prosecution of does not affect the reliability of the CI; it is only the logical conclusion of the misidentification disclosed in the affidavit. Thus, it would not affect the probable cause determination.

Similarly, disclosing that the CI had gone to the College Avenue apartment with another individual before contacting law enforcement would not affect the probable cause determination. A ruling that an informant who obtains knowledge of illegal activity is as a matter of law not a reliable source would turn law enforcement on its head.

Williams also asserts that the affidavit should have disclosed that the CI knew "Alabama" as "Charles," and that the CI never revealed this to law enforcement. The relevance of this omission is not apparent. Moreover, there is no evidence that Agent D'Antonio was aware that the CI had referred to "Alabama" as "Charles." (Tr. 140–41) [6]

Disclosure of the March 2008 physical altercation between the CI and "Alabama" likewise would not have undermined the probable cause determination. This altercation was part of a lengthy history of interaction between the CI and "Alabama" during the investigation. The affidavit did not purport to set forth every interaction between the CI and "Alabama." To the contrary, in his affidavit (S.W. Aff. ¶ 4), Agent D'Antonio stated that he had "summarized" "the facts and circumstances of this investigation" and had not "set forth the complete factual history of this investigation or all of its details." *See Vilar,* 2007 WL 1075041, at *27 ("[a]ll storytelling involves an element of selectivity, so it is not shocking that every affidavit will omit facts which, in retrospect, seem significant").

Finally, Williams argues that the affidavit should have disclosed that the CI was a paid informant. This is clearly correct, but there is no evidence that Agent D'An-

tonio knew that the CI was being paid by the NYPD. In any event, disclosure that the CI was a paid informant would not undermine the central facts establishing the CI's reliability: the CI's role in arranging "Alabama's" March 2008 firearms sale to an undercover officer, and the CI's October 2009 purchase of a firearm in the College Avenue apartment.

In sum, the falsehoods Williams cites were not necessary to the judge's probable cause finding, and addition of the omitted items does not undermine the probable cause determination. Accordingly, Williams has not made the showing necessary to justify a *Franks* hearing. *Salameh,* 152 F.3d at 113.

## II. **WILLIAMS' POST–ARREST STATEMENTS WILL BE SUPPRESSED**

Williams has moved to suppress statements he made to Agent D'Antonio and Detective Santiago at the 44th Precinct. These statements were made after Agent D'Antonio administered *Miranda* warnings to Williams, and after Williams indicated that he understood his rights and agreed to waive them. Williams argues that his statements must nonetheless be suppressed, because the *Miranda* warnings given at the 44th Precinct "were not sufficient to purge the taint of the [prior] unwarned statement [made at the College Avenue apartment]." (Sarafa Decl., ¶ 24)

### A. *Legal Standards*

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that

listened to a tape-recorded conversation of the CI and "Alabama" in preparation for the suppression hearing. (Tr. 11)

---

**6.** Detective Alicea—D'Antonio's source of information for the affidavit (Tr. 109)—testified that he was not aware that the CI had referred to "Alabama" as "Charles" until he

when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id.* at 478–79, 86 S.Ct. 1602.

■ "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter,* 489 F.3d 528 (2d Cir.2007) (citing *Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602).

Resolution of Williams' motion to suppress requires application of *Miranda* in a context in which (1) the defendant made a confession in response to interrogation while in custody and without benefit of *Miranda* warnings; and (2) the defendant was later given *Miranda* warnings, questioned about the same matters, and made additional admissions that were premised on the confession made during the first interrogation. The Supreme Court addressed two-stage interrogations in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and the Second Circuit put its own gloss on the law in this area in *United States v. Carter,* 489 F.3d 528 (2d Cir.2007) and in the recently issued *United States v. Capers,* 627 F.3d 470 (2d Cir. 2010).

In *Elstad,* 470 U.S. 298, 105 S.Ct. 1285, the Supreme Court considered the case of a teenage boy charged with burglarizing a neighbor's home. A witness had implicated Elstad in the burglary, and two police officers went to Elstad's home with a warrant for his arrest. *Elstad,* 470 U.S. at 301, 105 S.Ct. 1285. After arriving at Elstad's home, one of the officers—who did not administer *Miranda* warnings to Elstad—engaged in the following dialogue with him:

> "I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said, yes, he did, and also added that he had heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'"

*Id.*[7] Elstad was then brought to the local sheriff's office. About one hour later, El-

---

**7.** The police officers did not tell Elstad that he was under arrest prior to his admission of

stad was given *Miranda* warnings. He indicated that "he understood his rights, and, having these rights in mind, wished to speak with the officers." *Id.* Elstad then confessed to having committed the burglary of the Gross residence. *Id.*

The Supreme Court held that Elstad's confession, made after he waived his *Miranda* rights, need not be suppressed, even though his earlier admission of guilt had been obtained before *Miranda* rights had been administered. *Id.* at 318, 105 S.Ct. 1285. The Court stated that it would be

an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* at 309, 105 S.Ct. 1285.

The Court went on to state that

there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of

guilt. *State v. Elstad,* 61 Or.App. 673, 675,

this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Id.* at 318, 105 S.Ct. 1285.

In *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Court considered the constitutionality of a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda v. Arizona,* the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time.

*Id.* at 604, 124 S.Ct. 2601. A fragmented court held that "a statement repeated after a warning in such circumstances is inadmissible." *Id.*

A plurality of the *Seibert* Court stated that where law enforcement officers question a defendant without administering *Miranda* warnings, obtain admissions, then issue the requisite warnings and obtain a new round of admissions, the "threshold issue . . . is [ ] whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611–12, 124 S.Ct. 2601. Justice Souter, writing for Justices Stevens, Ginsburg and Breyer, set forth a list of factors to be considered in making this determination, including "the completeness and detail of the ques-

658 P.2d 552 (1983).

tions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [statements], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615, 124 S.Ct. 2601.

Justice Kennedy, however, concurred only in the judgment in *Seibert.* *Id.* at 618–22, 124 S.Ct. 2601. His concurrence notes that the plurality's "test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations." *Id.* at 621, 124 S.Ct. 2601. Justice Kennedy concluded, however, that "this test cuts too broadly," and stated that he "would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622, 124 S.Ct. 2601. In all other cases, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* ...." *Id.*

In *United States v. Carter,* 489 F.3d 528 (2d Cir.2007), the Second Circuit addressed the impact of *Seibert* on *Elstad.* The Circuit concluded that "*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession." *Id.* at 536. In all other cases, "the holding in *Elstad* applies." *Id.* The Circuit thus adopted Justice Kennedy's approach.

*Carter* involved questioning conducted after the execution of a search warrant at a Brooklyn restaurant. ATF agents recovered a large amount of drugs at that location. They subsequently arrested Michael Bearam, the appellant, who owned and operated the restaurant. *Id.* at 531. An agent who had been involved in executing the search warrant asked Bearam whether the brown powder recovered by agents was heroin. Bearam replied, "No, it's bad." The agent asked, "Bad what?" Bearam replied, "Bad coke." *Id.* at 532.

About 45 to 60 minutes later, at an ATF field office, a different agent read *Miranda* warnings to Bearam, who waived his rights and admitted that he dealt drugs and that the drugs recovered from the restaurant were his. Prior to making these incriminating statements, Bearam "was not told that the statement he had previously made could not be used against him." *Id.* at 533. The District Court suppressed Bearam's first statement referring to "bad coke," but denied the motion to suppress the second round of statements. *Id.*

The Second Circuit affirmed, finding that "a deliberate, two-step strategy was not employed." *Id.* at 536. The Court noted that the first agent had asked Bearam "only one question" and that accordingly "there was almost no overlap between [the first] statement and the full confession he gave after he received the warnings." In contrast to *Seibert,* agents did not obtain a full, unwarned confession, and then "essentially cross-examine[ ] [the defendant] about [his] confession ... after having been given the warning." Carter was questioned by different agents, in different locations. There was also no evidence that the second agent knew about the earlier statement. Accordingly, there was no continuity between the two rounds of questioning. The court also determined that the first agent's question was "not coercive," and that Bearam's answer was "voluntary." In light of the warnings later administered, and Bearam's written waiver, the court held that Bearam's post-

warning statements were admissible. *Id.* at 536–37.

Finally, in *Capers*, the Second Circuit considered two-stage interrogations conducted by a postal inspector in a stolen mail case. The inspector planted Express Mail envelopes—one of which was rigged with an alarm—in the mail-sorting facility in which Capers worked. *Capers*, 627 F.3d at 472–73. The envelopes contained money orders and cash. *Id.* The inspector observed the defendant and another employee, Lopez, carry mail into a trailer. *Id.* Less than a minute later, the alarm sounded, and inspectors apprehended both Capers and Lopez. *Id.* Without administering *Miranda* warnings, one of the inspectors—Hoti—"asked Capers where the contents of the Express Mail envelope were located," telling him that "I'm going to do my best to make you go away." *Id.* Capers told the inspector that the money orders were in his pants pocket. *Id.* The inspector retrieved the money orders. "The entire questioning took less than five minutes." *Id.*

> Inspector Hoti testified that he had not read Capers his rights because he was in a hurry to track down the missing money orders so that they did not get lost in the large mail-sorting facility and because he needed to question Lopez, who was held handcuffed outside the supervisor's office to determine his level of involvement in the crime.

*Id.*

▬▬ Capers was then brought to another postal service facility, where he was placed in an interview room and handcuffed to a chair. *Id.* at 473–74. Approximately 90 minutes after his arrest, Inspector Hoti read *Miranda* warnings to Capers, who executed a written waiver. Hoti made no reference to Capers' earlier statements, but "proceeded to question Capers about … what he did with the Express Mail envelopes earlier that night. Capers verbally confessed to taking the money orders." *Id.* Although the District Court had concluded that Inspector Hoti "did not have the 'specific intent' to circumvent Capers' *Miranda* rights," *id.* (quoting *United States v. Capers*, No. 06 Cr. 266, 2007 WL 959300, at *14 (S.D.N.Y. Mar. 29, 2007)), the Second Circuit rejected that credibility finding, ruling that Capers' second set of statements had to be suppressed, because Inspector Hoti's conduct "amounted to a deliberate, two-step interrogation technique designed to undermine the defendant's *Miranda* rights." *Id.* at 472.

*Capers* instructs that when a court confronts a two-stage interrogation, as here, it

> must address whether the officers employed a "deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview," *Seibert*, 542 U.S. at 621, 124 S.Ct. 2601, and if so, whether "specific curative steps," *id.*, were taken to obviate the violation that occurred.

*Id.* at 477. A "court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." [8] *Id.* at 479. In pursuing a deliberateness inquiry, the Second Circuit emphasized that courts must conduct "a searching and penetrating inquiry of the officer's testimony and proffered reasons for delaying *Miranda* warning[s]." *Id.* at 482. The Government bears the

---

8. The Court expressed doubt as to the veracity of testifying officers and agents in these circumstances, endorsing "Justice Souter's observation that 'the intent of the officer will rarely be as candidly admitted as it was' in *Seibert*." *Id.* at 479.

burden of disproving "deliberateness" by a preponderance of the evidence. *Id.* at 478–80.

Applying these rules to the evidence before it, the *Capers* court concluded that the Government had failed to meet its burden of demonstrating that a "deliberate, two-step strategy" had not been utilized to undermine Capers' *Miranda* rights. The Court rejected Inspector Hoti's explanation of why he had not initially given *Miranda* warnings to Capers as "lacking . . . credibility," given that he "had time to think through what procedural steps he would need to take following arrest in order to build his case for prosecution." *Id.* at 480–81. The Circuit further noted that "Hoti was experienced enough to know that in this case there was no valid reason to delay a *Miranda* warning until after questioning a suspect in custody." *Id.* at 481. The "[o]bjective evidence" likewise demonstrated that Capers had been "subjected to a two-step interrogation," given the "considerable overlap between the statements elicited from the defendant during the first and second interrogation," the common "inquisitorial environment" at both stages, and the "continuity of the cast of interrogating officers." *Id.* at 483. Finally, the Circuit noted "that Hoti's initial questioning of Capers was . . . a formal interrogation," and that "[o]nly 90 minutes separated the two interrogation sessions." *Id.*

Having concluded that "the inspectors employed a strategy to circumvent the defendant's *Miranda* rights," the Court went on to consider "whether any curative measures intervened to restore the defendant's opportunity to voluntarily exercise his *Miranda* rights." *Id.* at 484 (citing *Seibert,* 542 U.S. at 622, 124 S.Ct. 2601). The Court found no such curative measures, noting that the 90 minutes that elapsed between Capers' arrest and the

second interrogation, and the circumstances of the two interrogations, did not constitute a " 'substantial break' " that would have "restore[d] [Capers'] opportunity to voluntarily . . . exercise his *Miranda* rights." *Id.* at 484. The Circuit also noted that Hoti "never alerted Capers to [the] fact" that his "first statement would be inadmissible in court": "Hoti continued his line of questioning without dispelling Capers' probably assumption that he had already incriminated himself based on his first confession." Because the inspectors had pursued a "deliberate, two-step interrogation strategy," and given the absence of any "curative measures," the Second Circuit held that Capers' post-*Miranda* warning confession had to be suppressed. *Id.*

### B. *Application of Capers*

*Capers* sets a high standard for the admission of a second-stage confession following a *Miranda* violation. The implications of the decision are quite broad. Justice Kennedy, in rejecting the *Seibert* plurality's view authorizing suppression "in the case of both intentional and unintentional two-stage interrogations," proposed an approach that he envisioned would have a much more confined application:

> I would apply a *narrower test* applicable only in the *infrequent case, such as we have here,* in which the two-step interrogation technique was used in a *calculated* way to undermine the *Miranda* warning.

*Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J. concurring) (emphasis added).

██ The effect of *Capers,* however, is to take Justice Kennedy's test well beyond "the unique and never-again-to-be-repeated circumstances of *Seibert,*" *Capers,* 2007 WL 959300, at *11, and to apply it to

a much broader category of cases. This result is the consequence of the Circuit's burden of proof determination and requirement that law enforcement officers proffer a legitimate reason for not giving *Miranda* warnings during the first interrogation. While Justice Kennedy's test focuses on whether law enforcement officers acted with premeditation to undermine a *Miranda* warning they planned to give later—a test quite difficult for a defendant to meet—the Circuit's inquiry turns on whether the decision to forego *Miranda* warnings is legally justifiable. It is plain from *Capers* that this will almost never be the case:

> "[o]nce a law enforcement officer has detained a suspect *and subjects him to interrogation* . . . there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after a suspect has confessed. Instead, the most plausible reason . . . is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness."

*Id.* at 480–81 (quoting *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006)) (emphasis in original). The Circuit went on to state that "[t]he only legitimate reason to delay intentionally a *Miranda* warning until after a custodial interrogation has begun is to protect the safety of the arresting officers or the public. . . ." *Id.* (citing *United States v. Newton*, 369 F.3d 659, 677 (2d Cir.2004)). Applying *Capers* here, this Court is constrained to grant Williams' motion to suppress the statements he made at the 44th Precinct.

In contrast to the facts of *Elstad* and *Carter*, there is no doubt that Agent D'Antonio's questioning of Williams at the College Avenue apartment constitutes interrogation of a suspect in custody. Williams was handcuffed and placed under arrest immediately after officers entered the apartment. (Tr. 168) The firearms were in plain view and were seized "immediately on entry." (Tr. 174–75) "Seconds" after officers entered the apartment, Agent D'Antonio asked Williams "whose guns are these?" (Tr. 185), and Williams responded "that the firearms were all his." (Tr. 115)

There is also no doubt that Agent D'Antonio's purpose in questioning Williams was to elicit an incriminating testimonial response:

Q. So you asked whose guns those were?

A. That's correct.

Q. And that question was intended to prompt somebody to admit to owning those guns?

A. That was one of the reasons. And to find out possible information on the additional five guns, where they might have went to.

Q. Well, your question was who owns these guns, right?

A. Correct.

(Tr. 173; *see also* Tr. 188) ("it was an attempt to establish custody of those firearms")[9]

9. When Agent D'Antonio was asked explicitly on redirect whether his questioning of Williams prior to administering *Miranda* warnings—was intended to subvert the defendant's rights under *Miranda*, Agent D'Antonio merely repeated that he asked the question to establish ownership of the guns:

> Q. Turning back to Mr. Williams, when you asked him the questions about who owned the guns . . . was it your intention to

> ask him that question before you had read him—when you asked that question, had you informed him of his rights under Miranda?
> A. I had not at that point.
> Q. And was it your intention, when you asked that question without having yet informed him of his rights under Miranda, was it an attempt to get a statement from

It is also apparent that Agent D'Antonio was aware of his obligation to administer *Miranda* warnings before interrogating a suspect in custody. D'Antonio is a highly experienced law enforcement officer. He has been an ATF agent for eight years and he served as an NYPD officer for 15 years before joining ATF. (Tr. 101) Moreover, at the suppression hearing, D'Antonio did not contend that his failure to give *Miranda* warnings was the result of mistake or inadvertence.[10]

 When asked at the suppression hearing "why [he] didn't . . . read the suspect[s] their *Miranda* rights before asking any questions about the ownership of the

guns?", D'Antonio testified: "Because we were still trying to find who we thought was Philip Scott Alabama or Philip Burroughs. We thought they would still be around and would lead to multiple firearms that were not present at the location." (Tr. 115–16) D'Antonio's question about ownership of the guns, however, does not go to the whereabouts of "Alabama" or to the location of other firearms. Accordingly, the Court concludes that Agent D'Antonio interrogated Williams and Walker about ownership of the guns because—as Agent D'Antonio testified—he hoped that "somebody [would] admit to owning those guns."[11] Under *Capers*, obtaining such an

---

him before he had been informed of his rights under Miranda?

A. It was an attempt to establish custody of those firearms, in addition to trying to locate the additional five firearms that we had thought would be there and were not there.

(Tr. 187–88)

10. In cases denying suppression, the interrogating officers' good faith has been an important factor. *See, e.g., Carter*, 489 F.3d at 532 (noting that agent who elicited unwarned admission did not report the statement to second agent who conducted post-warning interrogation); *United States v. Hernandez*, No. 06 Cr. 46(GEL), 2006 WL 2242318, at *6 (S.D.N.Y. Aug. 3, 2006) (noting that "the officers here did not flout *Miranda*, Agent Cruz's testimony . . . makes clear that the agents' strategy here was premised on the good-faith belief that Hernandez was not in custody and that warnings were therefore not required" during the first round of questioning). Here, in contrast, the Government has not explained how Agent D'Antonio could have had a good faith belief that it was proper to question a suspect in custody about ownership of the seized guns absent *Miranda* warnings.

11. For these same reasons, the Government's "public safety" argument (Gov't Post–Hearing Br. 46–47; Gov't Supp. Mem. 4–5) is not persuasive. While, as the *Capers* court acknowledged, *Capers*, 2007 WL 959300, at *9, there is a public safety exception to the *Miranda* requirement, the Second Circuit has made clear that "the public safety exception

applies [only] where ' "questions [are] reasonably prompted by a concern for the public safety" or for the safety of the arresting officers.' " *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir.2005) (quoting *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir.2003) (quoting *New York v. Quarles*, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984))). Here, both Williams and Walker were in handcuffs, and law enforcement officials had seized the firearms in plain view and conducted a search of the apartment for other firearms. (Tr. 23, 114) As a result, neither the occupants in the apartment nor the firearms inside the apartment presented an immediate danger to the officers or to the public. *See United States v. Newton*, 369 F.3d 659, 679 (2d Cir.2004) (noting that seized "weapon no longer presented an immediate risk of danger" to law enforcement officers).

Moreover, the public safety "exception is limited by the fact that pre-*Miranda* questions . . . may not be investigatory in nature or 'designed solely to elicit testimonial evidence from a suspect.' " *Estrada*, 430 F.3d at 612 (quoting *Quarles*, 467 U.S. at 658–59, 104 S.Ct. 2626). "[T]o fall within the [public safety] exception, a question must have some rational relationship to defusing the perceived danger." *Newton*, 369 F.3d at 679 n. 8. While " 'precision crafting cannot be expected' in the circumstances of a tense and dangerous arrest," *Estrada*, 430 F.3d at 612 (quoting *Newton*, 369 F.3d at 678), it is apparent that Agent D'Antonio's question about who owned the guns was "investigatory in

**312**

admission is not a "legitimate reason to delay intentionally a *Miranda* warning until after a custodial interrogation has begun." 2007 WL 959300, at *9.

 Finally, it is undisputed that Agent D'Antonio never told Williams that the statement he made at the College Avenue apartment would be inadmissible. In *Capers*, the Second Circuit directed lower courts to "consider an experienced officer's failure to warn a suspect that an earlier admission, known to the interrogating officer, is inadmissible. Indeed, such an omission on the part of the interrogating officer is probative of a 'calculated' plan to subvert *Miranda*," *Id.* at 485 n. 6.

The objective factors cited in *Capers* likewise do not support the Government's position. With respect to overlap between the statements, Williams' confession at the College Avenue apartment was the premise for the later questioning at the 44th Precinct. At the police station, Williams provided background details for how he obtained the guns that he had admitted at the apartment were his, and described his sale of two of the firearms he had transported to New York from Alabama. D'Antonio's questions at both locations were essentially the same. (Tr. 115–16, 178–79) With respect to continuity of law enforcement personnel, Agent D'Antonio conducted the interrogation at both locations. (Tr. 115–16, 122, 173, 178–79) Agent Kelly was present at the apartment, and was present initially at the 44th Precinct. Detective Santiago was present both at the apartment and at the police station. "Finally, the temporal proximity of the pre- and post-warning interrogations, along with the continuity of [Williams'] custody, reasonably leads to the conclusion that the latter was a continuation of the former. Only [approximately 100] minutes separat-

ed the two interrogation sessions." *See Capers*, 2007 WL 959300, at *12. While the setting of the interrogations changed, "the inquisitorial environment of the questioning was consistent." *Id.*

In sum, both the subjective and the objective factors support Williams' argument that he was subjected to a deliberate two-step interrogation strategy. Accordingly, the Government has not met its burden under *Capers*.

 "Deliberateness having been established, [the Court] must next consider whether curative measures intervened to restore the defendant's opportunity voluntarily to exercise his *Miranda* rights." *Id.* (citing *Seibert*, 542 U.S. at 622, 124 S.Ct. 2601). Justice Kennedy gave two examples of curative measures: (1) " 'a substantial break in time and circumstances between the pre-warning statement and the *Miranda* warning,' and (2) 'an additional warning that explains the likely inadmissibility of the prewarning statement.' " *Id.* No such curative measure occurred here. There was no substantial break in time or circumstances, and Williams "had no reason to know that his first broad confession could not be used against him when, only [100] minutes later while still in close custody, he actually 'waived' his *Miranda* rights." *Id.* at 485.

Because the Government has failed to meet its burden under *Capers* of demonstrating that law enforcement officers did not employ a strategy designed to circumvent Williams' *Miranda* rights, and "because there were no curative measures to ensure that the defendant was not misled with regard to his rights prior to his second confession," *id.*, Williams' waiver of his *Miranda* rights was invalid. Accordingly,

nature" and was designed to elicit testimonial evidence—a confession as to who owned the

firearms. The question was not aimed at protecting the officers or the public.

the statements Williams made at the 44th Precinct must be suppressed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is DENIED as to all evidence obtained as a result of the search of 1200 College Avenue, Apartment 3C, Bronx, New York, and is GRANTED as to Williams' statements to law enforcement authorities at the 44th Precinct.

The Clerk of the Court is directed to terminate the motion: Docket No. 15.

SO ORDERED.