11-324-cr
United States v. Williams

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: March 5, 2012                    Decided: May 17, 2012)

Docket No. 11-324-cr

_____

UNITED STATES OF AMERICA,

*Appellant-Cross-Appellee*,

v.

ROBERT STEVEN BRODIE WILLIAMS,

*Defendant-Appellee-Cross-Appellant*.

_____

Before: MCLAUGHLIN, B.D. PARKER, WESLEY, *Circuit Judges*.

Appeal from an order of the United States District Court for the Southern District of New York (Gardaphe, *J.*) suppressing defendant's station house confession to unlawful dealings in firearms, following waiver of his *Miranda* rights. A Government agent had questioned defendant two hours earlier in the apartment where he was arrested without first issuing *Miranda* warnings. The district court suppressed the subsequent confession as the product of a deliberate, two-stage interrogation technique barred by *Missouri v. Seibert*, 542 U.S. 600 (2004).

**REVERSED** and **REMANDED**.

_____

JUSTIN ANDERSON, Assistant United States Attorney for the Southern District of New York (Rachel P. Kovner, Jesse M. Furman, Assistant United States Attorneys, *of counsel*, *on the briefs*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellant-Cross-Appellee*.

MELINDA SARAFA, Sarafa Law LLC, New York, NY, *for Defendant-Appellee-Cross-Appellant*.

Anthony S. Barkow, Sara H. Mark, Center on the Administration of Criminal Law at New York University School of Law, New York, NY, *for Amicus Curiae the Center on the Administration of Criminal Law at New York University School of Law*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

This appeal arises out of the suppression of defendant Robert Williams's station house confession to unlawful dealings in firearms.[1] That confession followed an incriminating statement made in response to brief questioning at the apartment where he was arrested earlier that day. The confession followed *Miranda* warnings; the earlier incriminating statement did not. The United States District Court for the Southern District of New York (Gardaphe, *J.*) suppressed the station house confession as the product of a deliberate, two-stage interrogation strategy barred by *Missouri v. Seibert*, 542 U.S. 600 (2004). Relying on this Court's decision in *United States v. Capers*, 627 F.3d 470 (2d Cir. 2010), the district court reasoned that the admissibility of defendant's station house confession turned on whether the decision to forego *Miranda* warnings at the apartment was "legally justifiable." *United States v. Williams*, 758 F. Supp. 2d 287, 310 (S.D.N.Y. 2010). Finding that it was not, the district court suppressed the station house confession. We conclude that the district court's determination rested on a misapplication of *Capers*. Accordingly, we reverse and remand for further proceedings.

---

[1] Williams is charged with conspiracy to engage in unlicensed dealing of firearms, *see* 18 U.S.C. §§ 371, 922(a)(1)(A), 922(a)(5), possession of a firearm after a felony conviction, *see id.* § 922(g)(1), and unlawful transportation of firearms, *see id.* § 922(a)(5).

**BACKGROUND**

In October 2009 Williams, along with his cousin Forenzo Walker, was arrested in a Bronx, New York, apartment following the execution of a search warrant that led to the recovery of four firearms. According to Williams's subsequent confession, he, Walker, and a man named Charles Smith had arrived in New York City the previous morning from Birmingham, Alabama. Williams and Smith planned to sell thirteen guns they had procured in Alabama.

Williams was not the primary target of the search warrant; Smith was. For a year and a half, officers of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the New York City Police Department ("NYPD") had, based on the report of a confidential informant, been investigating a man known to the informant as "Alabama" whom they suspected of buying firearms in Alabama for resale in New York. J.A. at 135. On the day of defendant's arrest, the informant spotted "Alabama" and two other men selling firearms at the Bronx apartment, and notified an NYPD detective. At the detective's instruction, the informant returned to the apartment and purchased a firearm from "Alabama" in the presence of the two other men. He then reported to the detective that multiple firearms were being sold by the three men at the apartment.

The detective relayed the information to ATF Special Agent Peter D'Antonio, who prepared an application for a search warrant that was issued around 8:30 p.m. that evening. D'Antonio, whom the district court found credible, testified at a suppression hearing that it was important to obtain the search warrant promptly because

> we had information that there was multiple firearms at the location being sold by two or three of those individuals. And there were totaling over 10 firearms . . . . At that point, we wanted to get the firearms off the street.

3

> We did not want them to get out of the apartment . . . [and] sold and used for illegal purposes up there.

*Id.* at 239-240.

Law enforcement officers executed the search warrant at approximately 10:30 p.m. NYPD personnel entered the apartment first and secured its four occupants: Williams, Walker, and two women. Five ATF agents, including D'Antonio and Special Agent Thomas Kelly, and several more NYPD police officers, including Detective Hector Santiago, then entered the apartment. They found Williams and Walker seated and handcuffed on the floor of the living room. Four semi-automatic handguns and ammunition lay beside them. They also observed one of the women "afraid" and "shaking" in the kitchen. *Id.* at 243.

On entering the apartment and observing the guns, D'Antonio asked Williams "whose firearms they were?" *Id.* at 244. Williams responded "that the firearms were all his" and "that he didn't want to get his cousin [ – Walker – ] involved." *Id.* Expecting to find closer to ten firearms in the apartment, D'Antonio also asked where the other firearms were, and where the third gun trafficker was. The record indicates no response from Williams to these latter two questions.

Following this brief questioning of Williams, D'Antonio, who is an ATF medic, turned his attention to the frightened woman, whom he "saw was progressively getting a little worse." *Id.* at 245. After checking her vital signals, he requested an ambulance. Approximately an hour later, following a search of the apartment, Williams was transported to the police station by D'Antonio.

Once at the station house, D'Antonio took Williams to a small interview room containing a desk and three to four chairs and removed the handcuffs. D'Antonio, in the presence of Kelly, then read Williams, who was "relatively calm," his *Miranda* rights, and he signed a form waiving them. *Id.* at 251. At that point, nearly two hours after Williams had initially been arrested, Kelly left the room and D'Antonio and Santiago proceeded to question him.

According to D'Antonio, Williams then gave a detailed statement. The statement contained information on a range of incriminating activity in connection with his conspiracy with Smith to buy guns in Alabama, transport them to New York, sell them, and divide the proceeds. During the interrogation, Williams did not ask the officers to stop the questioning, nor did he ask to speak to a lawyer.

When asked at the suppression hearing why he did not administer Williams *Miranda* warnings before questioning him at the apartment, D'Antonio responded, "Because we were still trying to find who we thought was ['Alabama']. We thought [he] would still be around and would lead to multiple firearms that were not present at that location." *Id.* at 244-245. When asked by defense counsel, "I guess what you're trying to do here is get the guns off the street, right?" D'Antonio responded,

> It's a public safety issue at that point. We had information that there was more than four guns, that there was approximately nine guns. And there was one individual and approximately five guns that were not there, so we were trying to mitigate the exposure to any other violence by trying to locate those additional five guns.

*Id.* at 301.

D'Antonio further testified that he viewed the station house interrogation as "a separate interview from the one [he] conducted in the apartment," not as "a continuation" of it:

5

> [T]he interview at the [] station house was the formal interview of Mr. Williams. . . . That was where we sat down with the individual, advised him of his rights, gave him the opportunity to either waive them or not and to speak with me if he chose to or not at that point. . . . [The purpose] was also . . . to establish evidence against the defendant at that point. And, also, to attempt to locate the individual that the defendant calls Charles Smith. And to try to locate him and the additional firearms.

*Id.* at 317-318.

Following his indictment, Williams moved to suppress his station house confession as the product of a two-step interrogation practice proscribed by *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert* arresting officers were taught to intentionally omit *Miranda* warnings until their interrogation produced a confession, administer the warnings, and then question the defendant based on his pre-*Miranda* confession, in order to get him to restate it. *Id.* at 605-06. Williams argued that D'Antonio was required to administer *Miranda* warnings prior to questioning him in the apartment and that, under *Seibert*, his failure to do so required suppression of the later "step two" station house confession.[2]

The Government contended in response that D'Antonio had not employed the two-step technique barred by *Seibert*. It further argued that the public safety exception to *Miranda* justified D'Antonio's asking immediate questions "aimed at determining whether there had indeed been an additional gun-seller on the premises; whether the people responsible for the firearms that the officers had found [were] among those secured in the apartment or [were] instead elsewhere; and where the additional male they had expected to find was." J.A. at 404;

---

[2] The Government does not appeal the exclusion of Williams's statement in the Bronx apartment acknowledging ownership of the four guns recovered there.

*see New York v. Quarles*, 467 U.S. 649, 655-56 (1984) (establishing public safety exception to *Miranda*).

Initially, the district court offered its view that, while the public safety exception might excuse D'Antonio's questions about the location of the missing guns and the third trafficker, his inquiry about who owned the guns "stepped outside the public safety exception . . . into a situation where the agent [wa]s trying to elicit an incriminating statement." J.A. at 435. Regardless, the district court

> [didn't] think the record would support a finding that [] D'Antonio pursued a deliberate strategy of trying to elicit incriminating statements that he could then use later to cross-examine the defendant after administering *Miranda* warnings. I don't see that deliberate strategy. . . . I didn't come away with an impression from the [suppression] hearing that [] D'Antonio's conduct here is similar to what was at issue in *Seibert*, which was a deliberate policy and strategy of eliciting incriminating statements without *Miranda* warnings with a plan to then later administer *Miranda* warnings and elicit those same incriminating statements. I didn't find that kind of deliberate strategy here. . . . I don't think the case is controlled by *Seibert*.

*Id.* at 436-437.

Notwithstanding this conclusion, the district court granted defendant's motion to suppress, concluding that it was "constrained" by this Court's subsequent decision in *Capers* to do so:

> *Capers* sets a high standard for the admission of a second-stage confession following a *Miranda* violation. The implications of the decision are quite broad. . . . The effect of *Capers* . . . is to take [*Seibert*] beyond "the unique and never-again-to-be-repeated circumstances of *Seibert*," and to apply it to a much broader category of cases. This result is the consequence of *[Capers's]* . . . *requirement that law enforcement officers proffer a legitimate reason for not giving* Miranda *warnings during the first interrogation.* While [*Seibert*'s] test focuses on whether law enforcement officers acted with premeditation to undermine a *Miranda*

7

> warning they planned to give later – a test quite difficult for a defendant to meet – [Capers's] inquiry turns on whether the decision to forego Miranda *warnings is legally justifiable.* It is plain from *Capers* that this will almost never be the case.

*Williams*, 758 F. Supp. 2d at 309-10 (emphasis added) (citations omitted) (quoting *Capers*, 627 F.3d at 483). The district court reasoned that because D'Antonio's unwarned questioning of Williams about ownership of the guns did not fall within the public safety exception to *Miranda*, but was instead intended to elicit an incriminating testimonial response, D'Antonio had no "legitimate reason" under *Capers* to delay the *Miranda* warnings. *Id.* at 311-12. Moreover, because objective evidence also pointed toward use of a deliberate two-step technique, and because no "curative measures intervened to restore the defendant's opportunity voluntarily to exercise his *Miranda* rights," Williams's waiver of those rights "was invalid," warranting suppression of his confession. *Id.* at 312 (quotation marks omitted). The Government appealed.

**STANDARD OF REVIEW**

We review a district court's determination regarding the constitutionality of a *Miranda* waiver *de novo*, and its factual findings for clear error, viewing the evidence in the light most favorable to the prevailing party. *United States v. Moore*, 670 F.3d 222, 226 (2d Cir. 2012).

**DISCUSSION**

The Government's main contention is that the district court erred in suppressing Williams's station house confession as the product of a deliberate two-step interrogation strategy. In *Seibert*, the Supreme Court found unconstitutional "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." 542 U.S. at 604 (plurality opinion). The "manifest

8

purpose" of such a protocol, a plurality of the Court explained, is to get a confession at the outset, because "with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble." *Id.* at 613. This technique, according to the plurality, evinced a police strategy adapted to undermine the effectiveness of the warnings when given. *Id.* at 616, 613. To determine whether such "warnings delivered midstream" could be effective, the *Seibert* plurality cited to five factors:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

While concurring in the judgment, Justice Kennedy believed the plurality's "objective inquiry from the perspective of the suspect" – which "applies in the case of both intentional and unintentional two-stage interrogations" – cut too broadly. *Id.* at 621-22. He advanced a narrower test applicable only in the "infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning" and no curative measures were taken to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. *Id.* at 622. Describing the circumstances in which it would be "extravagant" to conclude that a deliberate two-step technique had been used, he explained that

> [a]n officer may not realize that a suspect is in custody and warnings are required. *The officer may not plan to question the suspect or may be waiting for a more appropriate time*. Skilled investigators often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection.

9

*Id.* at 620 (emphasis added). In the absence of a finding of deliberateness, Justice Kennedy believed, the admissibility of any subsequent statement should continue to be governed by the principles of *Oregon v. Elstad*, 470 U.S. 298 (1985), which looks solely to whether the statements were knowingly and voluntarily made, *see id.* at 309.[3] *Seibert*, 542 U.S. at 622.

In *United States v. Carter*, 489 F.3d 528 (2d Cir. 2007), we joined our sister circuits in regarding Justice Kennedy's concurrence in *Seibert* as controlling. We concluded that *Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain the postwarning confession. *Id.* at 536. In *Capers*, we further joined our sister circuits in concluding that a court should review "the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." 627 F.3d at 479. Finally, we held that the Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy. *Id.* at 480.

Applying these principles, we hold that the Government has established, in light of the objective and subjective evidence, that D'Antonio did not engage in a deliberate two-step interrogation. There is no subjective evidence that D'Antonio asked Williams about the ownership of the guns, or the location of the missing guns or third gun trafficker, in a way calculated to undermine the *Miranda* warning given later at the station house. Crucially, the district court, which credited D'Antonio's testimony, reached the same conclusion prior to our

_____

[3] *Elstad* involved an accidental or mistaken interrogation in violation of *Miranda*. *See* 470 U.S. at 314. Under *Elstad*, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.*; *see also id.* at 318 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary.").

10

opinion in *Capers*. *See* J.A. at 436 ("I don't think the record would support a finding that []
D'Antonio pursued a deliberate strategy of trying to elicit incriminating statements that he could
then use later to cross-examine the defendant after administering *Miranda* warnings.").

Instead, "public safety considerations plausibly account" for D'Antonio's limited
questioning of Williams at the apartment "in a way that militates against finding that the first
interview was a premeditated attempt to *evade Miranda*." *Moore*, 670 F.3d at 231. D'Antonio
asked Williams three questions within a minute of entering an apartment that had only moments
earlier been secured by NYPD personnel. Observing only four guns on the floor when he
expected to find somewhere closer to nine or ten, and only two men handcuffed when he
expected to find three, D'Antonio asked (somewhat imprecise) questions to determine the
location of the missing guns and the third trafficker. In this context, his question about who
owned the guns is most plausibly understood as an attempt to ascertain which man was
"Alabama" – the primary target of the search warrant and the man whom law enforcement agents
had been investigating for a year and a half. Had Williams denied his (or Walker's) ownership
of the guns, D'Antonio may have been able to conclude that neither man was his target, and that
his search for "Alabama" should continue. Instead, Williams claimed ownership of the guns,
leading to the logical inference that *he* might be "Alabama," and prompting reasonable followup
questions about the location of the other guns and the third trafficker.

We are not required to decide whether the public safety exception actually excused this
line of questioning. The point is that none of it evinced "a deliberate strategy of trying to elicit
incriminating statements that [D'Antonio] could then use later to cross-examine the defendant
after administering *Miranda* warnings," as the district court properly found. J.A. at 436; *see also*

11

*United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (noting that "precision crafting cannot be expected in the circumstances of a tense and dangerous arrest" (quotation marks and brackets omitted)); *cf. Capers*, 627 F.3d at 481 (finding postal inspector's proffered reasons for questioning defendant incredible where arrest followed a full day of surveillance during which the inspector "had time to think through what procedural steps he would need to take following arrest in order to build his case for prosecution"). Instead, it suggests that D'Antonio was simply "waiting for a more appropriate time" formally to question Williams. *See Seibert*, 542 U.S. at 620. This is especially so where, after questioning Williams, D'Antonio immediately turned his attention to another public safety concern, the health of one of the women in the apartment.

In concluding that Williams's station house confession must nonetheless be suppressed, the district court relied on the mistaken belief that *Capers* changed the focus of the *Seibert* inquiry from whether law enforcement officers acted with premeditation to undermine a *Miranda* warning they planned to give later, to whether the decision to forego *Miranda* warnings was "legally justifiable." *See Williams*, 758 F. Supp. 2d at 310. In *Capers*, the defendant was caught in a sting operation stealing money orders from Express Mail envelopes. 627 F.3d at 472-73. After Capers and another individual were handcuffed, arrested, and separated, a postal inspector instructed Capers to follow him into a supervisor's office and said

> something like, look, you know, talk to me or don't talk to me, I don't care but I'm telling you right now or I'll tell you that I'm going to do my best to make you go away, and I just want you to know. And I've been watching you all day. I know everything that you did tonight.

*Id.* at 472 (quotation marks omitted). Without issuing *Miranda* warnings, the inspector continued to question Capers for around five minutes. Capers incriminated himself and, after

12

being transported to another facility where he was advised of his rights and interviewed again by the same postal inspector, incriminated himself again. At a subsequent suppression hearing, the inspector testified that he did not issue *Miranda* warnings in the supervisor's office because he

> was in a hurry to track down the missing money orders so that they did not get lost in the large mail-sorting facility and . . . needed to question [the other individual], who was held handcuffed outside the supervisor's office, to determine his level of involvement in the crime.

*Id.* at 473.

We affirmed the district court's suppression of both sets of statements. We observed that neither of these reasons justified delaying a *Miranda* warning once it is obvious that a suspect is in custody. In addition, we found the inspector's proffered reasons for delaying the *Miranda* warnings not credible. *Capers*, however, does not stand for the proposition that the Government must show that a delay in issuing *Miranda* warnings was for a "legitimate" reason, as the district court erroneously concluded. Rather, after expressly adopting Justice Kennedy's concurrence in *Seibert*, *Capers* sets forth the general test that in order to determine deliberateness "a court should review the totality of the objective and subjective evidence surrounding the interrogations." *Id.* at 479. *Capers* simply counsels that, in reviewing the subjective evidence, "closer scrutiny" should be given to an "investigator's testimony . . . when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the 'totality of the circumstances.'" *Moore*, 670 F.3d at 229 (quoting *Capers*, 627 F.3d at 484 n.5). As we clarified in *Moore*,

> [s]uch scrutiny is not ordinarily required when the reason for delay is legitimate, such as officer or community safety or when delay is a product of a "rookie mistake," miscommunication, or "a momentary lapse in judgment." Moreover, if it is found, after weighing the investigator's

13

credibility, that the investigator's intent was not "calculated . . . to undermine *Miranda*," delay will not require exclusion of the later, warned statement *even if the court finds that the delay was for an illegitimate reason and even in the absence of curative measures.*

*Id.* (emphasis added) (citations omitted) (quoting *Capers*, 627 F.3d at 482).

That is what happened here:  The district court found D'Antonio's reasons for questioning Williams about ownership of the guns "illegitimate" under *Capers*, because the questioning was neither justified by the public safety exception, nor explained by a "rookie mistake."  *See Williams*, 758 F. Supp. 2d at 311 (observing that D'Antonio is "a highly experienced law enforcement officer" who "did not contend that his failure to give *Miranda* warnings was the result of mistake or inadvertence").  Nevertheless, the district court found D'Antonio credible, and that he was not intentionally undermining *Miranda*.  In these circumstances, absent objective evidence of such an intention, D'Antonio's delay in issuing *Miranda* warnings does not require exclusion of the later, warned statement even if the public safety exception did not excuse the delay.

On this point, *Moore* is instructive.  There, we affirmed the district court's denial of a motion to suppress second-stage statements where an officer had previously asked a defendant – known to have been involved in a shooting incident from which no gun was recovered – where the gun was.  As here, the district court ruled that the public safety exception did not excuse the officer's failure to give *Miranda* warnings at the initial interview.  Nevertheless, we held, "public safety considerations plausibly account[ed] for the conduct of the police in a way that militates against finding that the first interview was a premeditated attempt to *evade Miranda*."

14

670 F.3d at 231. In affirming the district court, we emphasized that its holding regarding the public safety exception

> rested on a lack of exigent circumstances, *not on any adverse credibility finding regarding the testimony of [the officer]*. Although [the officer's] stated public safety rationale was insufficient to render *Moore*'s first statement admissible under the public safety exception to *Miranda*, it was sufficient, "in light of the totality of the circumstances," to show that [the officer] did not intend to circumvent *Miranda* with this unwarned questioning. Under *Capers*, therefore – *even in the absence of one of the recognized "legitimate" reasons for delaying* Miranda *warnings* – [the officer's] rationale does not bar admission of the second warned, statement, regardless of whether curative measures were undertaken.

*Id.* at 231 n.5 (emphasis added) (citations omitted) (quoting *Capers*, 627 F.3d at 484 n.5). The same logic holds here.

The objective evidence also weighs against a finding of deliberateness. In reviewing that evidence, we are guided by, but not limited to, the five factors identified by the plurality in *Seibert*. *Id.* at 230. *First*, the questions and answers in the first round of interrogation were neither complete nor detailed. D'Antonio asked a total of three questions to which Williams responded with a sole incriminating response: that he owned the four guns. The two-stage interrogation strategy described in *Seibert*, by contrast, was "systematic, exhaustive, and managed with psychological skill," leaving "little, if anything, of incriminating potential left unsaid." *Seibert*, 542 U.S. at 616. Here, the initial questioning was "brief and spare," focused on locating the missing firearms and gun trafficker. *See Moore*, 670 F.3d at 231; *see also Carter*, 489 F.3d at 536 (finding no deliberate two-step strategy where, half an hour after executing search warrant, officer asked defendant "only one question" regarding contents of

15

recovered bag of narcotics and defendant's response – that it was "'[b]ad coke'" – was "the only incriminating statement" made by defendant before receiving *Miranda* warnings).

*Second*, Williams's statements at the apartment and at the station house did not "appreciably overlap." *Moore*, 670 F.3d at 231. Williams's sole statement at the apartment tied him to ownership of four guns. By contrast, his full confession at the station house explained in detail the history, operation, and profit-sharing arrangements of his conspiracy with Smith, and elaborated significantly on his earlier statement. *See Carter*, 489 F.3d at 536 (finding "almost no overlap" between single incriminating statement and "full confession [defendant] gave after he received the warnings"). As D'Antonio testified, the interview at the station house was the formal interview with Williams and was aimed at giving him "the ability to express what happened" and obtaining evidence against him. J.A. at 189. Williams was not led "to cover the same ground a second time" – the type of objective evidence that raises *Seibert* deliberateness concerns because it suggests a focused attempt to make the defendant feel locked into his recently elicited inculpatory statements. *Seibert*, 542 U.S. at 604. That the station house interrogation, like the questioning at the apartment, also focused on the location of the missing guns and Smith's whereabouts is unsurprising given that both Smith and the guns remained missing.

*Third*, although there was some continuity of personnel between the apartment and the station house – namely, D'Antonio, Kelly, and Santiago – the timing and setting of the first and second statements do not suggest deliberate use of a two-step technique.[4] The initial questioning

[4] *Compare Seibert*, 542 U.S. at 605 (suppressing confession where the first- and second-stage confessions occurred in same place with only twenty minute break between), *and Capers*, 627 F.3d at 483 (affirming suppression where, although "the location of the interrogation sessions changed, . . . the

16

took place during the execution of a warrant in a residential setting and was spontaneous and somewhat frenzied. D'Antonio questioned Williams almost immediately upon entry, just after it had been secured by NYPD personnel. Moments later, D'Antonio requested an ambulance after one of the women in the apartment was found shaking in the kitchen. An hour-long search of the premises followed. The second interrogation took place in a small room at the station house almost two hours later. In contrast to the atmosphere in the apartment, at the station house Williams was calmly seated across a table from D'Antonio and Santiago, uncuffed, and volunteered a full confession.

*Fourth*, none of D'Antonio's questions, and nothing in the record, indicates that he treated the second round as continuous with the first. The quintessential two-step technique involves a suspect's "hearing warnings only in the aftermath of interrogation and just after making a confession," with the police "lead[ing] him over the same ground again." *Seibert*, 542 U.S. at 613. Here, almost two hours separated the two interviews. And nothing in the record suggests that the latter session was essentially a cross-examination using information gained during the first round of interrogation.

For these reasons, we conclude that the Government has met its burden of demonstrating that it did not engage in a deliberate two-step process intended to undermine Williams's Fifth Amendment rights.

---

inquisitorial environment of the questioning was consistent"), *with Elstad*, 470 U.S. at 302-03 (defendant's initial statement in his home did not "let the cat out of the bag" or "taint[]" his subsequent station house confession), *and Carter*, 489 F.3d at 536 (rejecting suppression where "first remark was made to [an officer] at [defendant's] store, while the full confession was made . . . at the ATF office over an hour later").

17

Finally, we conclude that Williams's statements were provided voluntarily and free of coercion. *Elstad*, 470 U.S. at 318. "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). This record reflects no such circumstances. The brevity and focus of D'Antonio's initial questioning, the near two-hour passage of time between interviews, and the contrast in setting between the apartment and the station house belie coercion. More importantly, the parties do not dispute that Williams knowingly and voluntarily waived his right to remain silent before the station house confession. These facts, especially the waiver, are "highly probative" of voluntariness. *See Elstad*, 470 U.S. at 318. For these reasons, we conclude that Williams's statements to D'Antonio at the station house may be admitted at trial.

**CONCLUSION**

The order of the district court suppressing defendant's station house confession is reversed and the case remanded for further proceedings consistent with this opinion.