NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

VICTOR ABRAHAM MARTINEZ, JR., *Appellant.*

No. 1 CA-CR 13-0107
FILED 10-21-2014

Appeal from the Superior Court in Maricopa County
No. CR2010-100587-001
The Honorable Roger E. Brodman, Judge
The Honorable Karen L. O'Connor, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Cory Engle
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Kent E. Cattani joined.  Presiding Judge Patricia K. Norris concurred in part and dissented in part.

**W I N T H R O P**, Judge:

**¶1**        Victor Abraham Martinez, Jr., appeals his convictions and sentences for second-degree murder, a class one dangerous felony and domestic violence offense, and child abuse, a class two felony and dangerous crime against children.  Martinez argues the superior court erred by admitting into evidence his statements to the police, alleging the police deliberately engaged in an unlawful "two-step" interrogation to undermine the effectiveness of a *Miranda*[1] warning.  For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

**¶2**        As a Tempe Police Department SWAT team executed a warrant to search a home in Guadalupe, Arizona, a man approached the residence.  Tempe Police Detective Tyler Watkins ordered the man to lie on the ground and handcuffed him, while other officers pointed their weapons at him.  Detective Watkins recognized the man as Victor Martinez, a "possible investigative lead" in the fatal shooting of his former girlfriend; in fact, the SWAT team was executing the search warrant on Martinez's home.  Martinez remained handcuffed under the guard of Detective Watkins for five to ten minutes, while Tempe Police Sergeant Michael Hill, who was supervising the investigation, instructed Detective Jennifer Baniszewski to invite Martinez to the police station for voluntary questioning.  Detective Baniszewski removed the handcuffs from Martinez and requested that he voluntarily speak with her at the police station.  Martinez agreed, and Detective Baniszewski and another officer

---

[1]        *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[2]        We view the evidence presented at the suppression hearing in the light most favorable to upholding the superior court's ruling admitting Martinez's post-*Miranda* statements.  *See State v. Ellison*, 213 Ariz. 116, 126, ¶ 25, 140 P.3d 899, 909 (2006).

handcuffed Martinez per Tempe Police Department policy and transported him to the station in an unmarked police vehicle; Martinez sat in the front passenger seat, while Detective Baniszewski sat in the back seat and the other officer drove. An officer removed the handcuffs at the police station.

¶3        At 11:38 p.m., Detective Baniszewski indicated to Martinez her view that he was at the station voluntarily, and that he was free to leave at any time. The detective then began interviewing Martinez without providing him with a *Miranda* warning. Throughout the interview, many of Martinez's statements and answers to the detective's questions were difficult to understand, internally inconsistent, and/or nonresponsive. Detective Baniszewski questioned Martinez extensively about his relationship with his former girlfriend, leading to him making statements about his arguments with her over the phone and in-person, and the detective repeatedly asked Martinez about the last time he saw the deceased. The detective also asked Martinez about "the part with the gun," which led to a discussion about Martinez's experience with firearms and an incident involving a gun and his father. Detective Baniszewski later told Martinez about evidence uncovered during the pending investigation, including small-caliber ammunition found in Martinez's home, phone records between Martinez and the victim, and the location of "the gun." The detective also confronted Martinez about the inconsistencies in his statements.

¶4        After two hours of questioning, Martinez told Detective Baniszewski "it was an accident," he "[b]lacked out," and he "threw [the gun] away . . . in the trash can at the bus stop . . . in Phoenix at 7th Avenue and Camelback." Shortly after these statements, Martinez asked for a shower. The detective responded, "[l]et me see what I can do," but continued to question Martinez. Soon thereafter, Martinez stated the "accident" happened in front of his house, where he "just blacked out . . . I started shooting and blacking out." Over the next forty minutes, an increasingly despondent Martinez provided often vague and/or nonresponsive answers to Detective Baniszewski's questions, while continuing to maintain the shooting was an accident and that he "started shaking and [] blacked out," until the questioning was terminated.

¶5        While Detective Baniszewski questioned Martinez, Sergeant Hill "periodically" listened in on the interview and communicated with Detective Baniszewski by text message. During the questioning, Sergeant Hill also placed two phone calls to an on-call deputy county attorney: first, to tell the attorney Martinez was being questioned and, second, because Sergeant Hill "wanted some general advice on . . . the prudent way to

proceed" given the interview had "reached a repetitive wall in questioning, [such] that it kept just going in circles" and because police had just obtained a search warrant for a buccal swab. After consulting the deputy county attorney, Sergeant Hill directed Tempe Police Detective David Larson to serve the search warrant on Martinez, read him the *Miranda* warning, and "continue on with the interview, if the subject was willing."[3]

¶6        Thirty minutes after Detective Baniszewski finished questioning Martinez, Detective Larson let Martinez use the restroom and brought him more water. After another thirty minutes, Detective Larson conducted the buccal swab search, advised Martinez of his rights pursuant to *Miranda*, and confirmed Martinez understood those rights.

¶7        Detective Larson began the interrogation by telling Martinez he was a "blank slate" and stating, "I really don't know anything that [has] been going on [with the previous interview]. Except that I know kind of what happened and why we're out here and what's being investigated right now." He asked Martinez to "walk [him] through . . . what happened Sunday afternoon." Approximately thirty minutes into the interrogation, Martinez admitted he held a loaded .22 caliber semi-automatic Ruger handgun in his right hand just before he "started shaking [and] blacked out," and he broke down when he "saw [his former girlfriend] not breathing." Martinez also stated the victim's daughter was asleep in her car seat in the back. Martinez told Detective Larson that he later got into the driver's seat next to his former girlfriend, drove the car a short distance to a parking lot, and left it there, along with the former girlfriend's body

---

[3]        The dissent relies on an unsupported premise in arguing that Sergeant Hill "admitted he had decided to 'pull' the first detective because the 'on-call' county attorney had become 'alarmed' about what had gone on during the first interrogation." *Infra* at ¶ 37. While questioning Sergeant Hill at the suppression hearing, defense counsel queried, "And when [the on-call attorney] tells you to pull Baniszewski because he's alarmed about what's going on, you followed that –- that request, or that order, correct?" The sergeant simply responded, "Yes." The description of the deputy county attorney as being "alarmed," however, was an unsupported characterization used only by defense counsel. As ultimately posed, defense counsel's question did not require Sergeant Hill to adopt that characterization in his answer, and he did not do so. In fact, nothing in the record supports that characterization of the evidence by defense counsel, a characterization not adopted by either Sergeant Hill or any other witness.

and the child.   At the conclusion of the interrogation, Detective Larson placed Martinez under arrest.

**¶8**          At a pre-trial suppression hearing, Sergeant Hill and Detectives Baniszewski and Larson testified there was no pre-interview plan to conduct a two-step interview.  Each stated there was no protocol or training program in the Tempe Police Department suggesting a procedure in which one detective would conduct a pre-*Miranda* interview, with another detective subsequently conducting a post-*Miranda* interrogation. Sergeant Hill testified he asked Detective Larson to advise Martinez of his rights pursuant to *Miranda* and interrogate him because the interview with Detective Baniszewski was "going in circles."   Sergeant Hill believed Martinez's custody status had changed with the buccal swab warrant and the need to press him harder; and the on-call deputy county attorney advised him to proceed with a second interview with a different detective. Detective Larson testified he had not watched Detective Baniszewski question Martinez because he was performing other tasks incidental to the investigation, including searching trash cans in Phoenix for the gun used to shoot the victim.[4]   He also testified he did not discuss the content of the questioning with Sergeant Hill, and Detective Baniszewski testified she did not discuss the questioning with Detective Larson.

**¶9**          The superior court determined Martinez was in custody during questioning by Detective Baniszewski, and although the statements were voluntary and not coerced, they were obtained in violation of *Miranda* and therefore inadmissible in the State's case-in-chief.  The court also found "there is no evidence to suggest that Detectives Baniszewski and Larson, or any other member of the Tempe Police Department, deliberately planned to undermine *Miranda* so that a 'two-step' interrogation technique could be implemented."   Further, after finding Detective Larson had advised Martinez of his rights under *Miranda*, Martinez had affirmed he understood those rights, and Martinez's statements were voluntary and not the result of any force or threats, the court ruled Martinez's statements to Detective Larson were admissible.

**¶10**          At trial, the State presented Martinez's statements to Detective Larson during its case-in-chief.  The jury convicted Martinez of the lesser-included offense of second-degree murder and of child abuse,

---

[4]     Detective Larson testified he did not know the source of the information leading him to that location.

and he was sentenced to aggravated, consecutive prison terms totaling forty-four years.

**¶11** Martinez filed a timely notice of appeal. We have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (West 2014),[5] 13-4031, and 13-4033(A).

## ANALYSIS

**¶12** The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States"). Pursuant to *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.

**¶13** The superior court excluded Martinez's pre-*Miranda* warning statements to the police, but Martinez argues the court erred by admitting his post-warning statements because the police deliberately employed an unlawful two-step interrogation technique. We review a superior court's ruling on a motion to suppress for an abuse of discretion. *State v. Cruz*, 218 Ariz. 149, 161, ¶ 47, 181 P.3d 196, 208 (2008). We defer to the court's findings of fact, but review *de novo* its conclusions of law. *State v. Zamora*, 220 Ariz. 63, 67, ¶ 7, 202 P.3d 528, 532 (App. 2009).

### I.     In Custody

**¶14** As a threshold matter, the State argues the superior court erred by finding Martinez was in custody before Detective Larson provided Martinez with a *Miranda* warning. The procedural safeguards of *Miranda* apply only when a suspect is "in custody or otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (internal quotation marks omitted). "Whether one is in custody is determined objectively: Under the circumstances,

---

[5] We cite the current version of the applicable constitutional provisions, statutes, and rules, because no revisions material to this decision have occurred since the events in question.

would a reasonable person feel deprived of his freedom of action?" *State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991) (citation omitted). Four factors guide this objective inquiry: (1) "whether the objective indicia of arrest are present," (2) "the site of the interrogation," (3) "the length and form of the investigation," and (4) "whether the investigation had focused on the accused."[6] *State v. Carter*, 145 Ariz. 101, 105, 700 P.2d 488, 492 (1985) (citation omitted); *see also Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). The "objective indicia of arrest" include "the booking process," the use of "physical restraints such as handcuffs," the display of weapons, and the manner in which the police transported the suspect. *State v. Cruz-Mata*, 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983).

¶15 In this case, although the police officers told Martinez he was free to leave and Martinez agreed to go to the police station for questioning, the superior court reasonably concluded that Martinez was "in custody" before receiving his *Miranda* warning based on the objective evidence presented at the suppression hearing. The objective indicia of arrest included the use of handcuffs and display of weapons outside the suspect's home, and the handcuffed transportation of Martinez to the police station. The pre-*Miranda* questioning took place in a police station interview room and took the form of a three-hour question-and-answer session, during which Detective Baniszewski confronted Martinez with the evidence in the investigation and inconsistencies in his statements. Although the police officers testified Martinez was "an investigative lead," this fact is irrelevant because nothing in the record suggests the police made this status known to Martinez. *See Stansbury*, 511 U.S. at 324 ("[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." (citation omitted)). Consequently, although there was some basis for the police officers' stated belief that Martinez was not in custody, we conclude the superior court did not err in finding he was in custody or abuse its discretion in suppressing his pre-*Miranda* statements.

---

[6] Although Arizona case law inconsistently includes this fourth factor in the custody analysis, we have included it here to resolve any doubts in our approach in favor of Martinez. *See State v. Wright*, 161 Ariz. 394, 397 n.1, 778 P.2d 1290, 1293 n.1 (App. 1989) (recognizing an inconsistency in Arizona case law).

*II.     Post-<u>Miranda</u> Statements*

**¶16**        We next consider the admissibility of Martinez's statements after the *Miranda* warning.  Relying on *Missouri v. Seibert*, 542 U.S. 600 (2004), Martinez argues the police deliberately engaged in an unlawful "two-step" interrogation to undermine the effectiveness of the *Miranda* warning, and that his statements are thus inadmissible.  We disagree.

**¶17**        Under *Oregon v. Elstad*, 470 U.S. 298, 309 (1985), statements made after a suspect is Mirandized are admissible notwithstanding an un-Mirandized prior interview, and the admissibility of any post-*Miranda* statement "should turn . . . *solely* on whether it is knowingly and voluntarily made."  (Emphasis added.)  "[A] careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible."  *Id*. at 310-11.

**¶18**        In *Seibert*, the United States Supreme Court created a limited exception to the *Elstad* rule, but only for cases in which law enforcement officers deliberately use the two-step interrogation technique "in a calculated way to undermine the *Miranda* warning."   542 U.S. at 622 (Kennedy, J., concurring).[7]  The *Seibert* analysis thus turns on whether law enforcement officers had a pre-determined plan to conduct a two-step process.

**¶19**        To make this determination, courts consider "objective evidence and any available subjective evidence, such as an officer's testimony."  *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006) (citing *Seibert*, 542 U.S. at 616).  Objective evidence includes:

> (1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken.

---

7        This court has previously concluded Justice Kennedy's concurrence in *Seibert* is the controlling opinion.  *Zamora*, 220 Ariz. at 69-70 n.8, ¶ 16, 202 P.3d at 534-35 n.8 (citation omitted).

*Id*. at 1160.[8]  The State bears the burden of proving by a preponderance of the evidence that it did not employ a deliberate two-step interrogation technique.  *See United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012).

**¶20**        If the court determines the police *deliberately* used the two-step technique, then "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Seibert*, 542 U.S. at 622.  If the court determines the police did not deliberately employ the two-step technique, "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id*.

**¶21**        In this case, the subjective evidence favors the admissibility of the post-warning statements.  At the suppression hearing, Sergeant Hill and Detectives Baniszewski and Larson each testified there was no protocol or training in the Tempe Police Department involving a deliberate two-step interrogation technique, and Sergeant Hill testified he did not direct the detectives to initiate such a technique.  By finding the evidence failed to demonstrate the officers acted deliberately to undermine *Miranda*, the superior court implicitly found this testimony credible.  Because the superior court is in a better position to determine credibility, we defer to its determination regarding this issue.  *See State v. Mendoza–Ruiz*, 225 Ariz. 473, 475, ¶ 6, 240 P.3d 1235, 1237 (App. 2010).  As a result, the subjective evidence supports the conclusion that the Tempe police officers did not employ a deliberate two-step interrogation strategy.

**¶22**        Turning to the objective evidence, the six factors, taken together, favor admissibility.  Under the first factor, the court examines the completeness and detail of the pre-warning interrogation; under the second factor, the court examines the overlapping content of both rounds of questioning.  Here, although Detective Baniszewski's questions in the pre-warning interview sought completeness, both the questions and answers revealed few details about the subject crimes.  Martinez described in detail his relationship with the victim, his background with guns, and the circumstances of his meeting with the victim, but he offered very little about

---

[8]        Although Justice Kennedy's concurrence relied on the intent of the interrogators to determine whether they deliberately employed a two-step technique, the use of objective evidence stems from the recognition that a police officer will rarely admit a deliberate attempt to circumvent constitutional rights.  *See Seibert*, 542 U.S. at 616 n.6 ("Because the intent of the officer will rarely be as candidly admitted as it was here . . . , the focus is on facts apart from intent that show the question-first tactic at work.").

the crimes to Detective Baniszewski beyond his statement that he "started shooting and blacking out" and repeated assertions that "it was an accident" and he was "shaking" as he "blacked out." As a result of Martinez's reticence to describe the details of "the accident" in the first round of questioning and Detective Larson's "blank slate" approach in the second round, there was some overlap in content, but the second interview went into much greater detail. For example, in his post-warning statements to Detective Larson, although Martinez repeated that he "started shaking [and] blacked out," he further acknowledged that he "saw her not breathing," and stated the victim "started bleeding [from] [h]er head." He also acknowledged that what he did was "wrong," and at the end of the second round of questioning, Martinez also stated that what he did "would be considered a crime."

¶23        The third factor, the timing and circumstances of both interrogations, weighs neither in favor of nor against the admissibility of Martinez's post-*Miranda* statements. The fact that Martinez was afforded a bathroom and water break, coupled with the full hour-long break in between rounds of questioning, tends to objectively signal a lack of continuity. However, the location of the questioning suggests continuity because both interviews occurred in the same room of the police station.

¶24        The fourth and fifth factors, the continuity of police personnel and the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first, favor admissibility because different detectives conducted the interrogations, and, unlike the detective in *Seibert*, Detective Larson did not refer to questions asked and answers elicited during the unwarned phase of questioning. *See Seibert*, 542 U.S. at 621 ("The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them."). Moreover, nothing objectively contradicts the testimony of Detective Baniszewski that she did not discuss her interview of Martinez with Detective Larson or Detective Larson's testimony that he was not briefed on the first interview by either Sergeant Hill or Detective Baniszewski. Further, although Sergeant Hill was the officer directing the investigation, nothing in the record suggests he coordinated the content of the two interviews or that Martinez was ever aware of his presence.[9]

---

[9]        The dissent highlights the role of the on-call deputy county attorney, concluding that when the attorney realized police officers had failed to Mirandize Martinez, he suggested ways to "manage and minimize" the

¶25          Finally, the sixth factor, whether any curative measures were taken, is evaluated when an interrogator has deliberately employed the two-step interrogation strategy, and requires the court to evaluate the effectiveness of the midstream *Miranda* warning. *See Seibert*, 542 U.S. at 615, 622; *Williams*, 435 F.3d at 1160. This factor weighs against admissibility in this case because the police took few curative measures to remedy any harm from the unwarned statements. Although the police undertook some curative measures, including advising Martinez that he was starting with a "blank slate" with a new officer, those measures did not include "a substantial break in time *and circumstances* between" rounds of questioning and/or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Seibert*, 542 U.S. at 622 (emphasis added).

¶26          Even though this final factor weighs against admissibility, the objective factors taken as a whole, and coupled with the subjective evidence, strongly weigh in favor of admissibility. We conclude that, under the *Seibert* analysis, the superior court did not err in finding the police officers did not deliberately use a two-step interrogation technique in an effort to undermine *Miranda*. Further, the record fully supports the court's determination that Martinez's "statements were voluntary and not the result of any force or threats," and Martinez does not otherwise challenge the statements pursuant to *Elstad*. *See Seibert*, 542 U.S. at 622; *Elstad*, 470 U.S. at 309. Accordingly, we conclude the superior court did not err by ruling the post-*Miranda* statements were admissible.

---

problem. *Infra* at ¶ 38. But there is no dispute that at some point after Martinez made incriminating statements in the pre-*Miranda* interview, there was an intentional decision to Mirandize him and attempt to obtain an admissible statement. This type of "intent" is not improper under *Elstad*, and the focus under the *Seibert* exception to *Elstad* is instead on whether the officers intended – prior to the first interview – to engage in a two-step process. The on-call attorney's alleged intervention in this case weighs in favor of – and not against – a finding that there was not a pre-determined plan to conduct a two-step interview. There would have been little or no reason to consult with the county attorney's office at any time before or during the first interview if police officers had pre-planned a two-step interview process. The second call to that office thus suggests the police officers had not anticipated the circumstances with which they were faced, and that there was not a pre-determined two-step interview plan.

**CONCLUSION**

¶27       For the foregoing reasons, we affirm Martinez's convictions and sentences.

**NORRIS,** Presiding Judge, concurring in part, dissenting in part.

¶28       This appeal arises out of statements made by the defendant, Victor Martinez, to one police detective, Jennifer Baniszewski ("first detective"), in which he admitted shooting the victim and leaving her for dead before being warned of his *Miranda* rights, and which he then repeated to a second police detective, David Larson ("second detective"), after being warned of his *Miranda* rights. I agree with the majority that the superior court did not abuse its discretion in finding Martinez was in custody before police finally warned him of his *Miranda* rights and in suppressing his pre-*Miranda* statements. *See supra* ¶ 15.

¶29       In addition to the circumstances noted by the majority in affirming the superior court's "in-custody" finding, *id.*, the length and form of the first detective's interrogation of Martinez would have lead a reasonable person to believe he was not free to leave and "go about his business." *State v. Zamora*, 220 Ariz. 63, 68, ¶ 10, 202 P.3d 528, 533 (App. 2009). By approximately 90 minutes into her interrogation of Martinez, the first detective had confronted him with discrepancies in his story and had repeatedly accused him of lying about what had happened. The first detective then pressed him to acknowledge and accept responsibility for shooting the victim which he then did:

> First detective: Okay, then tell me about it. You're sitting here saying lie . . . lie . . . lie . . . Tell me about the . . . Tell me about it? Show me that Victor cares. Show me that Victor wants to make it right . . . . You need to show me. Tell me what happened Victor.
>
> Martinez: I told you already.

First detective: No you didn't. You lied and you showed me that you could give a shit. You lied. . . . You show me you don't care. Please tell me there's someone in there that does. Victor.

Martinez: What do you want me to tell you?

First detective: Do you love her? Tell me did you love her?

Martinez: Yeah I did.

First detective: Then make it right for her. Tell me what happened? You're going to feel so much better when you do. . . .

Martinez: I'm telling you it was an accident.

¶30 After Martinez admitted "it" was an accident, and during the next 35 or so minutes, Martinez provided more details about the shooting, *see infra* ¶ 33, including acknowledging to the first detective he thought the victim had died "right away."

¶31 Because Martinez was in custody during the first detective's interrogation, the police were required to warn him of his *Miranda* rights. Thus, as the majority correctly concludes, the issue becomes whether the police deliberately engaged in an unconstitutional "two-step" interrogation to undermine the effectiveness of the *Miranda* warnings they finally gave to Martinez thereby rendering his post-*Miranda* statements inadmissible. *See supra* ¶ 16. Although I agree with the majority that to determine deliberateness, a court should consider the objective evidence and any available subjective evidence, such as a police officer's testimony,[10] *see supra*

_____

[10]On appeal, the State argues that whether police officers deliberately violated *Miranda* is governed by "a purely subjective standard" that focuses only on the subjective intent of the officers involved in the interrogations, although the State does acknowledge a court may consider objective evidence if it impeaches or rebuts the officers' testimony. This was not, however, the position taken by the State in the superior court.

¶ 19, I respectfully disagree with the majority's conclusion the superior court "did not err by ruling the post-*Miranda* statements were admissible." *See supra* ¶ 26. In disagreeing with the majority, I recognize that as a reviewing court, we normally defer to factual findings made by a superior court in ruling on a motion to suppress. But this deferential standard of review is inapplicable to the extent a superior court's ultimate finding constitutes a conclusion of law, *Zamora*, 220 Ariz. at 67, ¶ 7, 202 P.3d at 532, and we are not bound by a discretionary finding of fact when it is "not justified by, and clearly against, reason and evidence." *State v. Chappel*, 135 Ariz. 281, 297 n.18, 660 P.2d 1208, 1224 n.18 (1983). That is the case here.

**¶32** Turning to the objective evidence, *see supra* ¶ 19, the record demonstrates Martinez's statements to the first detective in the first interrogation were remarkably complete and detailed, contrary to the majority's characterization of what he said. *See supra* ¶¶ 3-4, 22. And, contrary to the majority's description of the first and second interrogation, *see supra* ¶ 22, the content of the two interrogations – measured by Martinez's answers – substantially overlapped.

**¶33** In the first interrogation, Martinez told the first detective he had argued with the victim ("I was asking her if she wanted to spend time with me" and "she said no."), the victim was in the front seat of her car, in front of his house, he had his gun in his right hand, he "started shooting and blacking out," he could not remember how many times the gun went off, but he "couldn't stop, my hand was shaking," and he thought the victim had died right away. He also told the first detective he had moved the victim's car and thrown away the gun. In the second interrogation, Martinez told the second detective the victim told him she did not want to hear from him that he loved her, although he did not mean to hurt her, he "didn't have no control over it," he had the gun in his right hand, he could not remember how many times the gun went off but "it just started going off and [I] started blacking out and then I freaked out after that," after the shooting, the victim was not breathing, he moved the victim's car, and gave "some guy" the gun.

---

There, the State affirmatively argued a court should consider the objective evidence and any available subjective evidence to decide deliberateness. Further, the State's argument flies in the face of this court's recognition in *Zamora* that to determine deliberateness, a court should consider the objective evidence and any available subjective evidence. 220 Ariz. at 70, ¶ 16, 202 P.3d at 535.

¶34    As is evident from this comparison, although certain of the details related by Martinez differ from the first interrogation to the second interrogation, much of what he said was the same.  In the first interrogation Martinez described the circumstances of the shooting, told the first detective he had shot the victim and left her for dead.  Martinez told the second detective essentially the same story.  The only material difference between the first and second interrogation was that in the second interrogation, Martinez acknowledged what he had done would be considered a crime.  Nevertheless, the first detective had essentially succeeded in obtaining a confession.  The die was cast.  And, given what Martinez had told the first detective, it did not take the second detective long to have Martinez repeat the story.  As Justice Kennedy explained in *Missouri v. Seibert*, "the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made.  The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained."  *Missouri v. Seibert*, 542 U.S. 600, 620, 124 S. Ct. 2601, 2615, 159 L. Ed. 2d 643 (2004).

¶35    That brings me to the timing and circumstances of the two interrogations.  As the majority notes, after the first detective finished the first interrogation, the police waited an hour—actually 66 minutes—before beginning the second interrogation.  Having elicited what was for all practical purposes a confession from Martinez in the first interrogation, the 66 minutes hardly signaled an objective break in the continuity of the questioning, as the majority states.  *See supra* ¶ 23.  Instead, from an objective standpoint, it simply signaled a brief pause in what was a single interrogation, albeit one involving two different detectives.  The second detective began the second interrogation by pressing Martinez for the details as to what had happened.  After only 24 minutes, Martinez began to tell the second detective what had happened just before he shot the victim; then in the next 40 minutes, Martinez told the second detective he had shot the victim, left her for dead, moved the car, and disposed of the gun.

¶36    Finally, I turn to the continuity of police personnel and the extent to which the second detective's questions treated the second interrogation as continuous with the first interrogation.  In this case, these factors are closely entwined.  Although the first detective testified at the suppression hearing she did not discuss her interrogation of Martinez with the second detective, *see supra* ¶ 8, and the sergeant in charge of the investigation testified he did not discuss the first interrogation with the

second detective,[11] the record reveals the sergeant and his role in the two interrogations provided both continuity between the two interrogations and the deliberate nature of the *Miranda* violation that occurred here.

¶37         The sergeant directed the investigation.  He was the one that assigned the first detective to interrogate Martinez.  He oversaw that interrogation and watched portions of it.  After Martinez had incriminated himself in the first interrogation, the sergeant spoke to the "on-call" county attorney who was advising him in the investigation.  After speaking to the "on-call" county attorney, the sergeant decided to take a break, bring in the second detective, and have the second detective advise Martinez of his *Miranda* rights.  Although at the suppression hearing, the sergeant first explained  he made that decision because the first detective had reached a "repetitive wall in questioning"—even though Martinez had admitted shooting the victim, leaving her for dead, moving the victim's car, and disposing of the gun—the sergeant then admitted he had decided to "pull" the first detective because the "on-call" county attorney had become "alarmed" about what had gone on  during the first interrogation:

> Q.  And when [the "on-call" county attorney] tells you to pull [the first detective] because he's alarmed about what's going on, you followed that – – that request, or that order, correct?
>
> A.  Yes.

¶38         Even though the sergeant did not explain what had alarmed the "on-call" county attorney, the only logical conclusion is that the "on-call" county attorney realized the police had failed to warn Martinez of his

---

[11]As the majority notes, at the beginning of the second interrogation, the second detective told Martinez he was a "blank slate" and "really [didn't] know anything that [had] been going on [in the first interrogation]."  *See supra* ¶ 7.  Whether the second detective was in fact a blank slate is open to question.  After interrogating Martinez for five minutes, the second detective questioned Martinez's statement that the victim was just a friend:  "well I know she's more than that . . . . But I know a little bit about what's going on and some of the things you're saying right now are a little different than what we all know is the truth.  So . . . Tell me about your relationship with her."

*Miranda* rights.[12]  The sergeant thus tried to manage and minimize the *Miranda* problem.  Otherwise, why take a break?  Why bring in a second detective?  After all, in the first interrogation Martinez had confessed to shooting the victim and leaving her for dead.  And, why direct the second detective to begin his questioning with the *Miranda* warnings? The answers are obvious.  Although the sergeant did not share with the second detective what had happened in the first interrogation, the sergeant knew what had happened.  The sergeant supplied the continuity between the first and the second interrogation.

¶**39**       The objective factors do not, thus, favor admissibility of Martinez's post-*Miranda* statements to the police.  And, neither does the subjective evidence presented by the State at the suppression hearing.

¶**40**       As the majority correctly notes, the record does not contain direct evidence that the officers had adopted a predetermined plan—before the first interview—to conduct an unconstitutional two-step interrogation. *See supra* note 9 and ¶ 26.  But, seldom will police admit to engaging in an unconstitutional two-step interrogation.

> Once a law enforcement officer has detained a suspect and *subjects him to interrogation*—as was the case in *Seibert* and is the case here—there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed.  Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness.

*United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006) (footnote omitted).  That is the case here.

---

[12]The majority suggests the involvement of the "on-call" county attorney demonstrates the police officers had not deliberately planned to undermine Martinez's *Miranda* rights through an unconstitutional two-step interrogation because they contacted him only after the first interview when they were faced with unanticipated circumstances.  *See supra* note 9.  The sergeant contacted the "on-call" attorney, however, before anyone interviewed Martinez, and consulted with the "on-call" attorney during the first interrogation.

¶41 First, the *Miranda* violation was not a "rookie mistake." The police interrogated Martinez beginning on January 4, 2010, and through the early hours of the next day. At that time, the sergeant had been with the City of Tempe for 24 years, and the first detective had been with the police department for 20 years. They were experienced officers and *Miranda* has been on the proverbial books since 1966.

¶42 Second, the reason given by the sergeant at the suppression hearing as to why the police had not warned Martinez of his *Miranda* rights is simply not credible, especially in light of his experience. At the suppression hearing, the sergeant suggested that the reason why police had not warned Martinez of his *Miranda* rights was because they initially had lacked sufficient information to arrest him. *Miranda* warnings, however, are not required only when police have probable cause to arrest. Probable cause to arrest is a relevant circumstance, but it is not dispositive, as the sergeant seemed to think. *State v. Dickey*, 125 Ariz. 163, 168, 608 P.2d 302, 307 (1980). Instead, *Miranda* warnings are required whenever police subject a person to a custodial interrogation. *Id.*; *see also State v. Carlson*, 228 Ariz. 343, 345, ¶ 7, 266 P.3d 369, 371 (App. 2011) ("[L]aw enforcement officers must affirmatively discharge their duties under *Miranda* whenever conducting a custodial interrogation.").

¶43 Third, even taking the sergeant's explanation at face value, the first detective's interrogation of Martinez became custodial when Martinez began to incriminate himself ("I'm telling you it was an accident."). Although at the suppression hearing the sergeant and first detective testified Martinez was still free to leave at the end of the first interrogation, their testimony is also not credible given Martinez's admission in the first interrogation that he had shot the victim and left her for dead. The first interrogation was a custodial interrogation and the police were obligated to advise Martinez of his *Miranda* rights, yet they failed to do so. Their explanations for not doing so are not credible in light of the circumstances.

¶44 The superior court found "no evidence to suggest that [the two detectives], or any other member of the Tempe Police Department, deliberately planned to undermine *Miranda* so that a 'two-step' interrogation technique could be implemented." Based on the objective evidence and the less-than-credible explanations offered by the police for the *Miranda* violation that occurred here, I disagree. I respectfully dissent from the majority's affirmance of the superior court's finding the police officers did not deliberately use a "two-step interrogation technique in an

effort to undermine *Miranda*." *See supra* ¶ 26. The superior court should have suppressed Martinez's post-*Miranda* statements. I would, therefore, reverse Martinez's convictions and remand for a new trial.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh